# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JOSE NEGRETE,

       Plaintiff,

vs.                                      No. CIV 06-0338 JB/LFG

MALOOF DISTRIBUTING L.L.C.,
A New Mexico Limited Liability Company,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Maloof Distributing, L.L.C.'s Motion for Summary Judgment, filed August 16, 2007 (Doc. 44). The Court held a hearing on the motion on October 9, 2007. The Court will grant in part and deny in part Maloof Distributing's motion. Maloof Distributing is not entitled to summary judgment on Negrete's discimination claims, because there is a genuine issue of material fact regarding his discharge. Negrete makes a prima facie showing of discriminatory discharge and disparate treatment. Maloof Distributing has presented genuine non-discriminatory reason for its discharge of Negrete, but Negrete was terminated under circumstances giving rise to an inference of discrimination because there is a genuine issue of fact regarding Maloof Distributing's company policy regarding "hot shot" delivery. Maloof Distributing is not entitled to summary judgment on Negrete's implied contract claim because there is an issue of material fact whether the employment relationship between Negrete and Maloof Distributing was altered by representations made by Maloof Distributing supervisors. Maloof Distributing is entitled to summary judgment on Negrete's prima-facie tort claim, because either Velarde's actions were not legal, or Negrete is unable to demonstrate that Maloof Distributing

and/or Velarde intended to injure him.

## FACTUAL BACKGROUND

While the parties agree on the basic outline of what occurred, many details remain in dispute. For example, the record is not clear on what Negrete's job at Maloof Distributing was and what other employees' jobs and supervisors were. Ultimately, the many issues in dispute combined leave the reason why Maloof Distributing terminated Negrete for the determination by the jury.

### A.    NEGRETE'S GENERAL WORK HISTORY.

Maloof Distributing employed Negrete from July 15, 2002 through December 17, 2004. See Defendant Maloof Distributing L.L.C.'s Motion for Summary Judgment ("Maloof Distributing's summary judgment motion") ¶ 1, at 3, filed Aug. 16, 2007 (Doc. 44).    Bill James, Maloof Distributing's area manager at the time of his retirement, hired Negrete. See Plaintiff Jose Negrete's Response to "Defendant Maloof Distributing, L.L.C.'s Motion for Summary Judgment ("Negrete's Response"), filed Sept. 17, 2007 (Doc. 52), Exhibit 6, Affidavit of Jose Negrete ¶ 4, at 1 (taken Aug. 26, 2007)("Negrete Aff."); Negrete's Response, Exhibit 13, Deposition of Billy John James (taken Aug. 31, 2007)("James Depo.") at 7:6-10.   Negrete contends that he was a driver for Maloof Distributing.  See Negrete Aff. ¶ 8, at 2.  Robert Bolin, supervisor of Maloof Distributing's Clovis office,  testified that Negrete was a driver/helper merchandiser.  See Negrete's Response, Exhibit 2, Deposition of Robert Bolin at 64:10-11(taken June 5, 2007)("Bolin Depo.").   Robert Leyva, Maloof Distributing's branch manager, testified that Negrete was a merchandiser driver assistant. See Maloof Distributing's summary judgment motion, Exhibit B, Deposition of Robert Leyva at 27:5-19 (taken June 5, 2007) ("Leyva Depo.").

Leyva testified that the merchandiser driver assistant job involved assisting the driver and, on occasion, delivering beer. See Leyva Depo. at 23:16-17.  Leyva testified that Negrete's job duties

were different from the job duties of Joe Samuels, another Maloof Distributing employee.  <u>See</u>
Leyva Depo. at 23:18-20.  Joe Samuels worked for Maloof Distributing for approximately two
years. <u>See</u> Negrete's Response, Exhibit 9, Affidavit of Joe Samuels ¶ 2, at 1(taken Aug. 31, 2007)
("Samuels Aff.").

Negrete represents that James placed him on three months probation and told him that, after
that period, he would become a permanent non-probationary employee.  <u>See</u> Negrete Aff. ¶ 4, at 2.
Negrete represents that James told him most Maloof Distributing employees were long term and had
worked there for years.  <u>See</u> Negrete Aff. ¶ 4, at 2.  Negrete represents that James told him that
Maloof Distributing fired non-probationary employees only for good cause or good reason.  <u>See</u>
Negrete Aff. ¶ 4, at 2; James Depo. at 14:11-15 (stating that it is general knowledge that non-
probationary employees were fired only for good reason or good cause, but that he did not recall
telling Negrete that information).

Negrete signed and dated an acknowledgment on July 15, 2002, stating that he had received
the Maloof Distributing Employee Handbook and agreed to read the handbook fully and completely.
<u>See</u> Maloof Distributing's summary judgment motion, Exhibit I, Acknowledgment (Doc. 44-11).
That Acknowledgment provides:

> I have this date received a copy of The Maloof Companies Employee Handbook.  I
> agree to fully and completely read the Employee Handbook, to request explanations
> of any area(s) which I do not understand so that I can reach a full and complete
> understanding of my conditions of employment, and to abide by the rules,
> regulations and policies contained therein.
>
> * * * *
>
> I further understand that as a matter of Company policy, all employment is offered
> to me at an "employment at will" basis, meaning that I may choose to terminate my
> employment at any time and for any reason without notice; and the Company is free
> to do the same as well.

Id.  Negrete also signed a document on July 15, 2002 entitled "Acknowledgment, Consent to Drug and Alcohol Screening Tests."   Maloof Distributing's summary judgment motion, Exhibit J, Acknowledgment, Consent to Drug and Alcohol Screening Tests (Doc. 44-12).  That document provides that, "as a condition of continued employment and in consideration of my continued employment, I hereby consent to cooperate in The Maloof Companies' Drug and Alcohol Screening Program by providing urine and/or blood samples when requested to do so at anytime while on the job."  Id.  That document also provided that Negrete would consent to "to release all medical test results to the management of The Maloof Companies to the extent necessary to establish a claim or defense in any controversy between me and the Maloof Companies."  Id.  The Maloof Distributing Companies Employee Handbook further provided: "[I]f you refuse to provide a urine and/or blood sample within three (3) hours of a request, it will be considered as a voluntary resignation of your employment."  Maloof Distributing's summary judgment motion, Exhibit E, Maloof Companies Employee Handbook ("Handbook") at 22 (Doc. 44-7).

Negrete contends that Maloof Distributing's company policy requiring drug and alcohol screening did not include the taking of hair samples.  See Handbook at 22.  Negrete contends that he was forced to give a hair sample on June 26, 2003.  See Negrete Aff. ¶ 17, at 4, Exhibit 1, Drug Testing Custody and Control Form (dated June 26, 2003) (indicating that head hair was taken from Negrete); James Depo. at 40:5-8.  Leyva testified that he requested Negrete give a hair sample, because Negrete failed to get a urine test.  See Leyva Depo. at 17:17-25.  Leyva testified he grew suspicious, so when Negrete came to Roswell to the drug screening facility, Leyva instructed the drug screening facility to make Negrete provide a hair sample.  See id. at 18:1-6.  The test came back negative.  See id. at 18:24-19:1.

On July 13, 2002, Negrete signed a document dated June 1, 1993 entitled "Loss Control

-4-

Policy Statement."  Maloof Distributing's summary judgment motion, Exhibit K, "Loss Control Policy Statement" (Doc. 44-13).  That Statement indicates that "[t]he objective of our loss control program has been to see that your work is performed without accidents or losses of any nature."  Id. It also asks Negrete to demonstrate his commitment to Maloof Distributing's loss control program by signing the document.  See id.

Bolin took over as supervisor of the Maloof Distributing Clovis office in 2003.  See Maloof Distributing's summary judgment motion, Exhibit H, Deposition of Sergio Lopez (taken June 7, 2007) ("Lopez Depo.") at 67:13-16.  Bolin reports to Mauro Martinez and Leyva.  See Maloof Distributing's summary judgment motion, Exhibit F, Deposition of Robert Bolin at 13:8-9, 30:12-15 (taken June 5, 2007) ("Bolin Depo.").  Greg Brown and Jim Russell are the co-vice presidents of Maloof New Mexico.  See Maloof Distributing's summary judgment motion, Exhibit L, Deposition of Mike Faul at 42:13-14 ("Faul Depo.").   Leyva is the branch manager and reports to Martinez. See Leyva Depo. at 3:18-24. Martinez is the area/district supervisor overseeing Leyva.  See id. Leyva testified that Negrete would see him about once a week, and that if Negrete had any issues, he could report them to Leyva.  See id. at 24:2-4.  Leyva was Negrete's ultimate supervisor.  See id. at 24:2-7.  Mike Faul was Assistant Manager at the Maloof Distributing Clovis office.  See Negrete Aff. ¶ 16, at 4.

Faul testified that he never had any problems with Negrete's work performance, and classified him as a "good," "honest," and "hardworking" employee.  Faul Depo. at 16:21-17:4. Eddie Montoya, a Maloof Distributing employee, represents that Negrete "conducted himself with the highest work ethic and was an honest hard working employee loyal to Maloof." Negrete's Response, Exhibit 7, Affidavit of Eddie Montoya (executed Aug. 29, 2007) ("Montoya Aff.") ¶ 3, at 1.  Montoya worked for Maloof Distributing between 2002 and 2004.  See Montoya Aff. ¶ 2, at

1.  Sergio Lopez, a Maloof Distributing employee, agreed that Negrete was a good employee, had a good attitude, was a hard worker and honest.  <u>See</u> Lopez Depo. at 61:5-13.  Before December 17, 2004, Negrete did not receive any oral or written warnings or reprimands for any work violations. <u>See</u> Negrete Aff. ¶ 10, at 3; James Depo. at 17:14:20.

Leyva testified that Negrete was a "fair" employee.  Leyva Depo. at 24:20-21.  Leyva testified he felt that Negrete never had a great attitude, and therefore he was not a great nor good employee.  <u>See</u> <u>id.</u> at 24:24-25:2.  Leyva testified that Negrete did not appear to be a team player and did not appear to care about the company.  <u>See</u> Leyva Depo. at 25:4-6.  Leyva testified that, to his knowledge, Negrete had never been coached by anyone.  <u>See</u> Leyva Depo. at 26:19-23.

## B.   HOT SHOTS.

Maloof Distributing contends that on March 1, 2004, a memorandum was circulated from Greg Brown to all Maloof Distributing employees regarding a liquor license citation.  <u>See</u> Maloof Distributing's summary judgment motion, Exhibit D, Memorandum dated March 1, 2004 ("March 1, 2004 Memorandum")(Doc. 44-6).  That Memorandum stated:

> I need to make everyone aware of a situation that happened recently.  There was a "special event" that was taking place in one of our markets.  Because the special event was successful, a couple of our accounts were running low on beer.  The sales group in charge of these accounts attempted to get an invoice run for these accounts on a Saturday.  The sales group was unsuccessful in getting an invoice run.  Even so, the sales group felt that it was extremely important to get the beer delivered so the account wouldn't be out of stock for the weekend.  The beer was delivered on that Saturday, February 28, 2004 without an invoice.  We were cited by Alcohol and Gaming.
>
> We were cited by Alcohol and Gaming because delivering a product without an invoice is a violation of the Liquor Control Act.
>
> I wanted to reiterate to all Maloof employees that delivering product without an invoice is unacceptable.  We do not break the law!
>
> I would like all Branch Managers to post this memo in your facility. In the future,

a violation of this statute is grounds for termination.

Id.  The Handbook also informed employees driving company vehicles that they are expected to "[o]bey all city, county, state and federal regulations."  Handbook at 37.  Negrete represents that he never saw the March 1, 2004 Memorandum.  See Negrete Aff. ¶ 19, at 4.  Negrete represents that neither Bolin nor any other Maloof Distributing employee discussed the March 1, 2004 Memorandum with him.  See id. ¶ 19, at 4.  Negrete represents that he never saw the memorandum posted on the bulletin board at the Maloof Distributing Clovis office.  See id. ¶ 19, at 4.

Montoya represents that he was not aware of the March 1, 2004 Memorandum.  See Montoya Aff. ¶ 4, at 1.  Montoya states that the March 1, 2004 Memorandum was not discussed by Montoya, Bolin, or any other Maloof Distributing employee.  See id.  He further represents that he never saw that memorandum posted on the bulletin board at the Maloof Clovis facility.  See id. at 4-5.

Lopez testified that he did not remember the  March 1, 2004 Memorandum.  See Negrete Response, Exhibit 5, Deposition of Sergio Lopez at 26:12-15. (taken June 7, 2007)("Lopez Depo.").  Lopez could not remember if the  March 1, 2004 Memorandum was discussed in the office or not.  See Lopez Depo. at 28:5-6.  Lopez never discussed the  March 1, 2004 Memorandum or its requirements with Negrete.  See Lopez Depo. at 30:4-5.  Lopez testified he did not see the  March 1, 2004 Memorandum before September of 2004.  See Lopez Depo. at 89:11-13.

Negrete contends that "hot shot" delivery of beers was a common practice at Maloof Distributing.  Negrete Aff. ¶¶ 15, 38, at 3, 9; Samuels Aff. ¶¶ 7, 10-12, at 2; Bolin Depo. at 20:20-24 (indicating that delivery of beer with a handwritten invoice happened); Faul Depo. at 19:10-23:1 (explaining that there are"hot shot" deliveries); Leyva Depo. at 49:7-50:4 (indicating that "hot shot" was when delivery of beer was made on a handwritten invoice).  "Hot shot" delivery is the unscheduled delivery of beer with or without an invoice.  See Negrete Aff. ¶ 15, at 3.  One "hot

shot" delivery is when an account calls in and says it needs:

> this or that, or you realized on your own they needed extra beer, and if you would call the warehouse in Roswell, and the person that was making invoices -- In other words, running the computer wasn't there anymore, just the loaders were there, they would put some beer on the truck for that account. And when it arrived in Clovis, you would make an invoice -- a handwritten invoice for that.

Faul Depo. at 19:10-22. The other delivery would be to take beer from one account and put it over to another account that needs the beer, but no beer actually leaves the warehouse. See Faul Depo. at 22:21-23:2. In that instance, the Maloof Distributing employee writes a credit invoice for the first account, and writes a sale invoice for the second account, so that the two invoices match. See Faul Depo. at 22:12-22:22. Negrete contends that drivers kept blank invoices in their trucks for situations where beer would come on the semi-truck from the warehouse in Roswell without an invoice for delivery to a customer with a handwritten invoice. See Negrete's Response at 1.

Negrete contends that there is no Maloof Distributing policy about beer being in a company vehicle without an invoice. See Negrete Aff. ¶¶ 29, 38, at 7, 9, Montoya Aff. ¶ 4, at 1. Negrete contends that he never delivered beer without an invoice, and that all he did was load beer from one company truck to another company truck. See Negrete Aff. ¶ 26, at 6.

Negrete represents that Faul instructed him to deliver beer without an invoice to businesses between March and December of 2004. See Negrete Aff. ¶ 16, at 4. Negrete contends that Faul specifically requested Negrete deliver beer without an invoice in November of 2004. See Negrete Aff. ¶ 23, at 6. Negrete represents that Faul told Negrete to take beer to customers so it could be added to the order the next day. See Negrete Aff. ¶ 16, at 4. Negrete represents that Faul told him to take ten cases of beer to a customer before a scheduled delivery the next day, and then add it to the delivery. See id. Negrete represents that he thought that if he refused to make "hot shot" deliveries, he would be fired. Id.

-8-

Negrete also represents that he was required to follow James' orders without question and that those instructions included delivering beer without an invoice to various businesses in Clovis, New Mexico.  See Negrete Aff. ¶ 14, at 3.  James admits that uninvoiced beer was delivered from Roswell on occasion.  See James' Depo. 22:10-17.  James stated: "It was a mistake in the loading crew at night loading the truck.  Maybe they would throw an extra case or a case that didn't get counted would be on there."  Id.

Samuels represents that he "had delivered 'hot shot' beer for Maloof Distributing both before and after March 1, 2004."  Samuels Aff. ¶ 10, at 2.  Samuels represents that Leyva asked him to put beer on "the semi-truck without a computer generated invoice on more than one occasion."  Samuels Aff. ¶ 12, at 2.

Negrete contends that James forced him to mix out-of-date beer with new beer.  See Negrete Aff. ¶ 7, at 2.  Negrete believed the practice was dishonest, but followed James' instructions because he did not want to lose his job.  See id.  Lopez testified that he was required to buy out-of-date beer from the Roswell warehouse out of his own pocket.  See Lopez' Depo. at 84:19-24.

## C.    THE DECEMBER INCIDENT.

On December 17, 2004, David Velarde, an investigator for Maloof Distributing, was tailing the semi-truck that Samuels was driving from Roswell because Samuels' sister-in-law had alleged that Samuels was giving beer to his wife on the way to Clovis.  See Leyva Depo. at 29:4-30:7, 43:11-16.  Velarde was communicating with Leyva via cellular telephone regarding his surveillance. See Negrete's Response, Exhibit 10, Deposition of David Velarde at  34:12-14. (taken July 6, 2007) ("Velarde Depo.").  Velarde observed Samuels' semi-truck, Negrete's van, and Faul's Chevy S-10 all parked at the Walgreen's in Clovis.  See id. at 26:22-24.

Velarde then observed Negrete and Samuels park in the Veterans of Foreign Wars' parking

lot in Clovis.  <u>See</u> <u>id.</u> at 27:17-18.     Velarde testified that he saw Negrete and Samuels unload approximately twenty-five cases of beer into the back of Negrete's van.  <u>See</u> <u>id.</u> at 26:5, 28:14-17. Velarde testified that he called Leyva and advised Leyva of what he was observing.  <u>See</u> <u>id.</u> at 29:17-19.

Velarde testified that Leyva advised him that "it sounded to him like an unauthorized exchange of beer or unauthorized beer unloading." <u>Id.</u> at 29:20-23.  Velarde testified that he then followed Negrete to his home.  <u>See</u> <u>id.</u> at 32:20-24.  Velarde testified that Negrete parked the van, and then got into a blue Chevrolet pickup truck and drove off.  <u>See</u> <u>id.</u> at 34:22-35:2.

Velarde came to the conclusion at that point, after talking with Levya, that the beer was being stolen.  <u>See</u> <u>id.</u> at 35:18-20.  Velarde called the police.  <u>See</u> <u>id.</u> at 35:24-25.  Velarde told Leyva that he witnessed an individual go to Negrete's residence, briefly speak to Negrete's wife, and then that individual proceeded to unload cases of beer from the Maloof Distributing van parked in front of Negrete's residence.  <u>See</u> <u>id.</u> at 68:25-69:12.

Negrete contends that the beer loaded onto his company van at the Veterans of Foreign Wars on December 17, 2004 was "hot shot" beer.  Negrete Aff. ¶¶ 26,-27, 29, at 6-7; Samuels Aff. ¶¶ 6-9 at 1-2.  Negrete admitted to Velarde that he did not have an invoice for the beer that he was allegedly planning to deliver later in the day.  <u>See</u> Negrete Depo. at 76:12-15, 119:11-12.  Negrete contends, however, that he violated no company policy on December 17, 2004.  <u>See</u> Negrete's Response at 17. When confronted by Velarde, Negrete admitted he had beer in his van without an invoice.  <u>See</u> Negrete Depo. at 76:23-25, 119:10-12.

Leyva testified that Negrete admitted that he was going to deliver the beer "hot shot." Leyva Depo. at 80:3-6.  Leyva testified Negrete could not identify the account to which he was planning to deliver the "hot shot" beer.  <u>Id.</u> at 80:5-9.  Leyva testified that Negrete told him that he did not

plan to get an invoice before delivering the beer.  <u>See</u> Leyva Depo. at 80:3-6.  Negrete and Samuels represent that Samuels was supposed to call Negrete after Samuels returned to Roswell, and tell him where the beer was supposed to go.  <u>See</u> Negrete Aff. ¶ 26, at 6; Samuels Aff. ¶ 13, at 2.

Negrete represents that he parked the Maloof Distributing van in front of his house, and left to complete personal errands between 2:00 p.m. and 3:00 p.m.  <u>See</u> Negrete Aff. ¶ 28, at 7.  Negrete represents that, when he returned home, a tow-truck was in the front of his house, preparing to tow the company van.  <u>See</u> <u>id.</u>  Negrete represents that Velarde approached him and yelled at him, saying: "I saw everything you have stolen beer in the vehicle, did you have an invoice."  <u>Id.</u>

Negrete represents that Velarde told him that he saw Negrete give beer to someone else.  <u>See</u> <u>id.</u>  Negrete represents that Velarde told him that he was going to have the Maloof Distributing van towed.  <u>See</u> <u>id.</u>  Negrete represents that he gave Velarde the key to the van.  <u>See</u> <u>id.</u>  Negrete represents that Velarde told him that he was going to call the police and have Negrete arrested for theft.  <u>See</u> <u>id.</u>  Negrete represents that he went back inside his house and telephoned Samuels.  <u>See</u> <u>id.</u>

Leyva testified that Velarde told him that he observed a person walk to the front door of Negrete's house, speak with someone who he believed to be Negrete's wife, and then that person proceeded to the back of the van, opened the doors, and offloaded approximately nine cases to his personal vehicle.  <u>See</u> Leyva Depo. at 69:5-12.  Negrete represents that some of the "hot shot" beer was stolen from Negrete's van while it was parked at his home.  Negrete Aff. ¶ 30, at 7.  Negrete represents that one six-pack of Coors Light and thirty six-packs of Key Stone were stolen by the unknown thief.  <u>See</u> Negrete Aff. ¶ 30, at 7.

Negrete represents that the Maloof Distributing van's doors did not properly lock.  <u>See</u> Negrete Aff. ¶ 31, at 7.  Negrete represents that he "was required to deliver beer in [his] own

personal vehicle because the Maloof van was broken down." Id. ¶ 31, at 7. Lopez testified that there was nothing in writing at Maloof Distributing of which he was aware that required vans to be locked during the day. See Lopez Depo. at 80:9-11.

Third parties had stolen beer from Maloof Distributing trucks before December 17, 2004. See Negrete Aff. ¶¶ 18, at 4. Negrete represents that, in 2004, he "was unloading beer at Goober McCools in Portales, New Mexico when an unknown individual stopped and stole beer from the semi truck [he] was helping to unload." Id. "[N]either [he] nor the semi-truck driver [were] reprimanded." Id. See Negrete's Response, Exhibit 11, Portales Police Department Report, at 3, dated May 21, 2004, filed Sept. 19, 2007 (Doc. 109-6)(stating that the victim was Maloof Corporation, that the driver parked at a Town & Country food store and unloaded some beer, and that, when he returned to Goobers, he discovered that he was short a 30 pack of beer, valued at approximately $11.95). If beer was stolen off of a truck, the drivers or deliverymen were to call the police immediately. See James' Depo. at 40:15-18.

Velarde testified that he called the police in December, 2004. See Velarde Depo. at 42:10. Velarde testified that he told the police that Negrete and Samuels took the beer without authorization. See id. at 43:5-13. Velarde testified he did not ask Negrete why Negrete did not have an invoice. See id. at 44:18-21. Velarde testified that Negrete denied stealing the beer. See id. at 44:15-17.

Negrete contends that Velarde falsely accused him of removing beer from his company van into a pick-up truck. See Negrete's Response at 39. Negrete represents that Velarde observed Negrete leave his home before the pick-up arrived and someone took beer from the company van. See id. Velarde testified that he saw Negrete leave in a black Ford F-150 and drive off. See Velarde Depo. at 38:19-24. Velarde testified that the driver of the pickup then began offloading cases of

product from the van to the pickup. See Velarde Depo. at 39:16-19.

Negrete contends that the Clovis Police Department contacted him for embezzlement. See Complaint ¶ 13, at 3. Negrete represents that he spent eight hours in jail. See Negrete Aff. ¶ 34, at 8. Negrete represents that the embezzlement charges were later dropped against him. See Negrete Aff. ¶ 33, at 8.

Negrete contends that Velarde made false accusations to the Clovis Police that he had seen Negrete offload multiple cases of assorted beer into another vehicle. See Negrete's Response, Exhibit 1, Clovis Police Department Incident Report, at 1-3 (dated Dec. 17, 2004) ("Clovis Incident Report"). In Velarde's signed statement to the Clovis Police Department, Velarde states that he saw the driver of a pickup walk to the Maloof Distributing van, and offload beer and load it into the pickup. See Clovis Incident Report, at 16-17. Velarde reports that he confronted Negrete, who was standing to the rear of the van. See Clovis Incident Report at 17. Velarde reports that he introduced himself to Negrete and then demanded the keys to the van. See Clovis Incident Report at 17. Velarde testified at his deposition that he disagreed with the statement contained within the Clovis Incident Report that stated: "Then Mr. Velarde followed the van back to Mr. Negrete's residence and observed Mr. Negrete off-load multiple cases of assorted beer into another vehicle." Velarde Depo. at 51:23-52:9.

On December 20, 2004, a Memorandum was circulated from Robert Leyva to Laura Schwebach, with copies to Russell, Martinez, Jose Benavidez, and Bolin. See Memorandum dated December 20, 2004 ("December 20, 2004 Memorandum"), filed Oct. 2, 2007 (Doc. 112-5). The subject of the December 20, 2004 Memorandum was the "Clovis Investigation." Id. at 1. In that Memorandum, Leyva reports that he received an anonymous telephone call stating that Samuels was involved in embezzlement and selling of Maloof Distributing property -- beer. See id. Leyva

-13-

reports that he contacted Greg Brown, who then directed him to Mike Rzendian, who then had Velarde contact Leyva. See id. Leyva reports that Velarde then made plans to meet Leyva in Roswell on December 16. See id. Leyva reports:

> The following morning Mr. Velardez followed Mr. Samuels to all his deliveries where he saw him taking two cases of beer out of Chilies and put one case in the back of an alleged employee's trunk and one in the back of his delivery trailer. When his paperwork was reviewed, there were no credits issued for that account. Mr. Velardez informed me of that transaction and I recommended that he continue to follow Mr. Samuels around to see what he did with that case of beer. The rest of the day, deliveries were made as normal. On the last stop, Mr. Velardez [sic] observed Mr. Samuels, Mr. Negrette [sic], and Mr. Faul make a delivery to Walgreen's, the last stop on the list. The delivery appeared to go as normal, nothing seemed out of the ordinary at one point Mr. Velardez saw Mr. Faul glance into the delivery trailer. After the stop Mr. Velardez [sic] observed Mr. Samuels and Mr. Negrette [sic] pull behind the V.F.W. in Clovis where through a chain linked fence he observed them load a vast amount of beer into the company van Mr. Negrette [sic] had been driving. After conferring with me, we decided it would be best at that point to follow the van. Mr. Velardez [sic] observed Mr. Negrette [sic] drive the van home where he parked it and took off possibly to lunch. Because Mr. Velardez [sic] felt we needed someone from the company other than himself to approach Mr. Negrette [sic] and being that Mr. Faul was the only supervisor in Clovis and had glanced into the delivery truck, I decided to test Mr. Faul's involvement. I asked Mr. Faul on two separate occasions to look into the vehicle to see if he would confirm that the beer was in fact there, but both times came up with an excuse as to why he could not glance into the vehicle with the last excuse being that the van simply just not there. Mr. Velardez [sic] confirmed that the van never moved from the spot in which it was in. During one more final attempt to get Mr. Faul to cooperate, Mr. Velardez [sic] called me and told me that someone in a Blue and Grey Dodge pick-up arrived at Mr. Negrette's [sic] residence and removed a large quantity of beer. At that point I instructed him to call the police and approach Mr. Negrette [sic]. I then instructed Mr. Faul that a security officer from the company was there and that he must immediately meet him at Mr. Negrette's [sic] home. After hearing what Mr. Velardez [sic] had to say, the police arrested Mr. Negrette [sic] and filed a warrant for Mr. Samuels' arrest. That evening I drove to Clovis where I put Mr. Faul under suspension pending the outcome of the investigation.

> The following Monday morning Jose Benavidez and I spoke with Joe Samuels where I asked him if he was aware of the situation in Clovis, he replied no. I then informed him that Mr. Negrette [sic] had been caught with un-invoiced beer at his residence and had been arrested. I then asked him if he hew [sic] where he may have gotten the beer and he said he had no idea, then he speculated that he may have possibly stolen it from one of the accounts when he leaves them there to finish

-14-

putting up the load.  I then asked him if he had given any hot shots to Mr. Negrette [sic] to deliver at a later time, he said no.  I then explained to him that the company had a person doing surveillance and had witnessed him offloading beer from his truck into Mr. Negrette's [sic] van and at this point he was under suspension pending the outcome of the investigation.  Mr. Negrette [sic] claimed that the whole event was just a misunderstanding, that the beer was just a hot shot that had been sent out without an invoice.  When he asked if that was the case why someone approached his home, spoke with his wife, and then opened the doors to the van where he offloaded the product onto his vehicle, he then proceeded to draw out a scenario where possibly one of Mr. Samuel's acquaintances knowing that he would be out of town may have possessed a key given to him by Mr. Samuels gained entry to the van and offloaded product.  Mr. Negrette [sic] made numerous attempts to try and explain what had happened, but none were credible or made any sense.  At that point Mr. Russell terminated him and made it clear that the company would prosecute him to the fullest extent of the law.  Later that evening we met with Mr. Samuels where he was also terminated.

December 20, 2004 Memorandum at 1-2.

Bolin testified that a meeting was held on December 20, 2004.  See Bolin Depo. at 17:18-19. Bolin testified that the meeting was held at the Clovis office.  See id. at 17:25-18:1.  Bolin testified that Martinez, Leyva, Russell, Negrete, and himself were at the meeting.  See id. at 17:20-22, 18:5-7.

Bolin testified that Negrete "changed his story two or three times.  He first said he didn't know where the beer was supposed to go."  Id. at 18:25-19:4.  Bolin testified that Negrete first denied knowing about the beer, then Negrete said he did not know where the beer was going, and lastly stated that Samuels was supposed to tell him later where the beer was supposed to go.  See id. at 19:23-20:6.  Bolin testified that he did not believe the decision to terminate Negrete had been made before the meeting.  See id. at 18-21.

Negrete contends that he was terminated on December 20, 2004.  See Exhibit 3 to Negrete Aff., Maloof Companies Action Form (dated Dec. 20, 2004) ("Action Form") (stating that Negrete was terminated for "not following company procedures and pending investigation by Clovis Sheriffs Department for 25+ cases of product not accounted for with no paperwork to support or explain

product."). Negrete contends that Russell told Leyva to tell him that he "was in serious problems, he didn't know about [Negrete's] citizenship, but [Negrete] was going to spend time in jail, and then they were going to probably send [him] back to Mexico." Negrete Aff. ¶ 37, at 8. Negrete represents that he became a United States citizen in 1986. See Negrete Aff. ¶ 1, at 1. Negrete represents that Russell pointed his finger at Negrete's face and told him that, if he would not "confess" to stealing the beer, Russell "was going to do everything in his power to have [Negrete] convicted and sent back to Mexico." Negrete Aff. ¶ 37, at 9. Russell testified that he does not recall making that statement. See Russell Depo. at 16:16-19. Leyva testified he did not recall Russell telling Negrete that statement. See Leyva Depo. at 13:18-14:1. Bolin testified that Russell did not make that statement to Negrete. See Bolin Depo. at 33:23-34:2.

Russell admits telling Negrete: "I'm going to do everything to prosecute you." Russell Depo. at 19:1-3. Russell admits he told Negrete it was possible that Negrete may go to jail. See id. at 19:4-5. Russell admits he told Negrete he was fired. See id. at 19:14-15.

Russell prepared the Action Form at the meeting when he fired Negrete. See id. at 20:2-8. Russell testified that he told Negrete at the meeting that, if he would admit his guilt, Russell would call the security officer to get the charges dismissed. See Russell Depo. at 30:19-21. Russell admits that part of the reason he terminated Negrete was that, in his opinion, Negrete had stolen or embezzled beer from Maloof Distributing. See id. at 35:2-7.

Russell testified that it was the policy of Maloof Distributing as of December 20, 2004, that employees could be terminated only for good cause. See id. at 35:14-17. Russell testified that he believed he "absolutely" had good cause to terminate Negrete. See id. at 35:8-10. Russell testified that he was not happy when he found out that the criminal charges against Negrete had been dismissed, because he wanted to proceed with the prosecution of the theft and "have that in the

records." Russell Depo. at 33:24-34:3.

Negrete contends he was not paid his two-weeks vacation time after his termination on December 20, 2007, in violation of Maloof Distributing's written policies. See Negrete Aff. ¶ 41, at 9, Handbook, at 11.

Negrete did not know that a white employee, Samuels, was terminated for the same incident as Negrete until after this lawsuit was filed. See Negrete Depo. at 79:2-5. Samuels represents that he worked as a driver for Maloof Distributing for approximately two years. See Samuels Aff. ¶ 2, at 1. Leyva testified that Negrete's job entailed assisting the driver and, on occasion, delivering beer. See Leyva Depo. at 23:16-17. Leyva testified that Negrete's job duties were different from Samuels' job duties. See Leyva Depo. at 23:18-20. Samuels represents that Maloof Distributing fired him in December of 2004 for allegedly stealing beer. See Samuels Aff. ¶ 3, at 1. Samuels represents that he was never charged in a criminal complaint for stealing beer. See Samuels Aff. ¶ 17, at 3. Velarde, Leyva, and Edmund Opoza, Maloof Distributing employee, noted in their statements to Clovis Police that Samuels was the semi-truck driver involved in the incident. See Clovis Incident Report at 17, 19-20. The Criminal Complaint against Negrete for Fourth Degree Felony Embezzlement mentioned only Negrete. See Clovis Incident Report at 21-22.

Negrete contends that Samuels had been involved in numerous workplace infractions. See Negrete's Response at 15. Negrete contends that Samuels had been coached before his termination regarding sloppiness of work. See Leyva Depo. 21:25-22:22. James recalls problems with Samuels being sloppy in his person. See James Depo. at 27:8-12. Leyva testified that he was aware of Samuels notoriety for sloppiness. See Leyva Depo. at 19:11-14. Lopez represents that he complained to James and Bolin about Samuels' sloppiness, but that neither supervisor did anything about his complaint. See Lopez' Depo. at 69:15-70:21. The week before December 17, 2004,

Leyva went to Samuels home to discuss some time off that Samuels had taken, because Leyva believed that Samuels had falsified the reason for his requested time off.  See Leyva Depo. at 105:19-23.

Leyva testified that Faul was a "co-conspirator" in the December 17, 2004 incident, but Maloof Distributing did not fire Faul.  See id. at 64:22-65:2, 97:17-98:2; Exhibit 1 to Levya Depo., Memorandum from David Velarde to Jim Russell at 2 (dated Dec. 20, 2004) (stating that Leyva and Velarde "came to the same conclusion that maybe Mike Faul was someway involved as a co-conspirator in this unauthorized activity.").  Velarde accused Faul of embezzlement, but Faul was never fired or prosecuted.  See Clovis Incident Report, Voluntary Statement of Edmund K. Opoza. In Velarde's opinion, Faul was involved in stealing beer.  See Negrete's Response, Exhibit 10, Deposition of David Velarde (taken July 5, 2007) ("Velarde Depo.") at 36:24-37:9.

Faul did not lose his job, but instead was demoted to salesman and received a cut in pay.  See Faul Depo. at 59:15-19.  Faul also testified, however, that his demotion did not result in him losing any money, because Maloof distributing compensated him for the pay cut in personal time off.  See id. at 60:2-17.

Although Leyva believed that someone in Roswell loaded the beer in question without an invoice, nobody in Roswell was fired.  See Leyva Depo. at 97:20-22.  Lopez testified that un-invoiced, out-of-date beer came from Roswell.  See Lopez Depo. at 84:19-85:5.

## D.   MALOOF  DISTRIBUTING  EMPLOYMENT  POLICY  ON DISCIPLINE/TERMINATION.

Each Maloof Distributing employee undergoes a ninety-day probationary period.  See Handbook at 8. Negrete contends that Maloof Distributing had a policy and practice of progressive discipline and "good cause" termination of its non-probationary employees.  See Bolin Depo. at

15:2-17; Leyva Depo. at 11:3-16; Lopez Depo. at 53:4-55:12; James Depo. at 6:11-22, 7:11-16, 14:11-15:2.  Negrete also contends that the Handbook set out progressive discipline from "coaching action up to and including separation of employment."  Handbook at 30.  James testified that most Maloof Distributing employees were long term and had worked for Maloof Distributing for years.  See James' Depo. at 14:24-15:2.

Maloof Distributing has a "No Harassment Policy" which "prohibits racial, religious, or other harassment undertaken on any basis, which can include use of derogatory language, labels, jokes, or taunts based upon or making reference to that individual's race, religion, or ethnic group, posting of offensive cartoons or drawings, or other actions taken against another individual because of that person's race, religion, or ethnic group."  Handbook at 24.  Maloof Distributing's policy provided an internal complaint procedure for any employee raising a complaint of illegal harassment or violation of Maloof Distributing's anti-discrimination or anti-harassment policy.  See id.  An employee was advised to first discuss the matter with his or her supervisor.  See id.  "Attempts will be made to resolve complaints informally by supervisory counseling whenever possible."  Id.  If the supervisor was the cause of a complaint, or the employee did not feel comfortable discussing the complaint with the supervisor, or if the supervisor failed to resolve it, then the employee could make a complaint to the Human Resources Department.  See id. at 24-25.

"Negrete was to report work problems or difficulties first to his immediate supervisor Sergio Lopez, then Mike Faul and finally Bill James."  Negrete's Response, at 13.  See James' Depo. at 17:7-13.  Maloof Distributing contends that Negrete did not properly complain to his supervisor, Bolin.  See Defendant Maloof Distributing, L.L.C.'s Reply to Plaintiffs Response to Defendant's Motion for Summary Judgment ("Maloof Distributing's Reply"), at 4-5, filed Oct. 2, 2007 (Doc. 112)(quoting Negrete Depo. at 16:3-7).

**E.      SPECIFIC INSTANCES OF DISCRIMINATION.**

James testified that Negrete and Lopez were the only Hispanics at the Maloof Clovis office. See James' Depo. at 30:13-17.  James testified that all the other employees were white.  See id. at 30:18-21.

Negrete represents that he did not have a key to the building, while a white employee, who was hired after him, had a key.  See Bolin Depo. at 54:17-24 (stating that Mark Caveat, an employee who started working after Negrete, may have had a key); Lopez Depo. at 44:17-25 (stating that Negrete may have mentioned not having a key, and he could have asked for one, but Lopez did not think he was going to be issued one and that managers issued keys and not everybody had a key); Negrete Aff. ¶ 12, at 3.  Bolin testified that Caveat would need a key to get signs out of the office. See Bolin Depo. at 55:6-10.  Bolin testified that Negrete also put up signs, but that Negrete never had a problem getting into the office or getting the signs.  See id. at 55:11-3.  Bolin testified that the only way to get into the office was with a key or if someone opened it for you.  See id. at 55:24-56:2.  Negrete represents that he was "forced to wait until someone came to open the office before entering."  Id.  Negrete represents that he asked Bolin for a key, and Bolin said he was going to make a copy, but never did.  See id.

Negrete contends that he was hired as a driver before Samuels, but was paid fifty dollars less per week than Samuels.  See Negrete Aff. ¶ 9, at 2-3, Samuels Aff. ¶ 2, at 1.

Negrete contends that he was denied the opportunity to go to mandatory drivers meetings in Roswell.  See Negrete Aff. ¶ 11, at 3.  Negrete represents that Bolin told him that someone was needed to pull beer from the stores.  See id.  Negrete represents that other white drivers were allowed to go to the meeting.  See id.  Bolin denied telling Negrete that he should not go to drivers' meetings in Albuquerque or Roswell.  See Bolin Depo. at 16:14-16.  Bolin also denies telling

Negrete that he had to stay in Clovis to stock beer rather than go to a meeting.  See Bolin Depo. at 17:6-9.

Negrete represents that James forced him to mop the warehouse in Clovis, New Mexico.  See Negrete Aff. ¶ 13, at 3.  Negrete represents that another newly hired employee who was white was not forced to mop the floors.  See id.  Negrete represents that he never saw James require white employees to mop.  See id.  Negrete represents that, when the Maloof Distributing warehouse closed and they were moved to a smaller office, he was still required to vacuum the floor, but other white employees were not required to mop.  See id.

Negrete contends that Samuels repeatedly called him "a lazy Mexican.".  Negrete Aff. ¶ 20, at 4, Negrete's Response, Affidavit of Joe Samuels  ¶ 24, at 4(taken Aug. 31, 2007) ("Samuels' Aff").  Samuels called Negrete "a lazy Mexican" in front of James, Faul, and Bolin on a frequent and continuous basis during his employment with Maloof Distributing.  Samuels' Aff. ¶ 24, at 4.  James, Faul, and Bolin never corrected Samuels, and "in fact laughed at these comments."  Id.  Bolin testified that he never heard James make any of those statements to Negrete.  See Bolin Depo. at 56:18-20.

Negrete contends that James referred to him and other Hispanics as "punk."  Negrete Aff. ¶ 21, at 5.  James admitted he probably referred to Negrete and other Hispanics working on Maloof Distributing as "punk."  James' Depo. at 29:5-7.  James "also would grab his genitals and say to [Negrete] 'this salchicha [sausage in English] is for you.'"  Id.  James would also tell Negrete "'hurry up Mexican' and 'come on Mexican, lets get it on Mexican.'"  Id.

Montoya represents that James told him the same comments.  See Montoya Aff. ¶ 5, at 2.  Montoya represents that James made those comments frequently after the time Negrete was hired in July of 2002 and continued almost daily until James retired from Maloof Distributing in October

-21-

of 2004.  See id.  Montoya represents that James would raise his voice at Hispanics and "otherwise make demeaning and racial remarks towards Hispanics." Id.  Montoya represents that James treated white employees more favorably.  See id. ¶ 6, at 2.  Montoya represents that a white employee named Walter was hired after Negrete, but was immediately made a pre-sales employee instead of being made a driver first before being promoted to pre-sales.  See id.  Montoya also represents that Walter was given time off for his honeymoon within two weeks of starting at Maloof Distributing, despite the fact that Walter was still on probation.  See id.

Negrete reports that James' comments were offensive to him, embarrassed him, and made it difficult for him to do his job.  See Negrete Aff. ¶ 21, at 5. Negrete represents that he was afraid that if he complained too much that James would retaliate and Negrete would lose his job.  See id. Negrete also represents that he was intimidated by James' physical size, because James is approximately six feet five inches tall.  See id.  Negrete contends that neither Samuels nor James treated the white employees the way they treated him, called the white employees names or subjected them to obscene gesturing at their genitals. See id. ¶ 22, at 5.

Montoya represents that James' behavior made him hate to go to work.  See Montoya Aff. ¶ 7, at 2.  Montoya represents that Falt told him to ignore James.  See id.  Montoya represents that he did not complain further because he was intimidated by James' demeanor and height.  See id. Montoya represents that was afraid if he complained about James' treatment that he would be fired. See id. Montoya represents that Faul told other employees to ignore this racial discrimination.  See Montoya Aff. ¶ 7, at 2.

Negrete represents that he was "discouraged from attempting to complain about racial harassment after being brushed aside by" James.  Negrete Aff. ¶ 20, at 5.  Negrete represents that Faul was present during the time that disparaging remarks were made about Negrete, but did nothing

to stop the harassment.  See Lopez Depo. at 78:25-79:1-10; Negrete Aff. ¶ 20, at 5.

James retired in October of 2004, see Montoya Aff. ¶ 7, at 5, 2,  and Bolin was an "indirect" supervisor  of Negrete at the time of Negrete's termination.  See Bolin Depo. at 15:18-16.  Bolin testified that he did not "deal with [Negrete] that much directly."  Bolin Depo. at 16:5-6.  Samuels represents that Bolin was present when Samuels called Negrete "a lazy Mexican . . . on a frequent and continuous basis."  Samuels Aff. ¶ 24, at 3.  Samuels represents that James grabbed his genitals and said "'this chorizo [sausage in English] is for you Mexican" in front of Bob Bolin on a repeated basis, but Mr. Bolin never did anything to correct Mr. James."  Samuels Aff. ¶ 22, at 4.  Samuels represents that Bolin did not correct Samuels and "in fact laughed" at Samuels calling Negrete "a lazy Mexican."  Samuels Aff. ¶ 24, at 4.

Maloof Distributing concedes that the use of derogatory terms when referring to Hispanics is against Maloof Distributing's anti-discrimination and anti-harassment policies.  See Handbook, at 18-19, 23-26, 31.

## PROCEDURAL BACKGROUND

On April 26, 2006,  Negrete filed his Complaint for Employment Discrimination, Violation of 42 U.S.C. § 1981, Breach of Express Contract, Breach of Implied Contract, and Prima Facie Tort against the Defendant, Maloof Distributing, L.L.C. ("Complaint").  See Doc. 1. On February 16, 2007, the parties filed the Initial Joint Status Report and Provisional Discovery Plan.  See Initial Joint Status Report and Provisional Discovery Plan, at 1, filed Feb. 16, 2007 (Doc. 17).  On pages 2-5, Negrete summarized his contentions:

> During the time that Mr. Negrete was employed by Defendant, Maloof discriminated against Mr. Negrete with respect to the terms, conditions and privileges of employment because of his race -- Hispanic. This discrimination consisted of Defendant making unfounded complaints against Mr. Negrete. Mr. Negrete was at all times material [sic] qualified to do his job.

> During the time that Mr. Negrete was employed by Defendant, there was a policy of only terminating employees for good cause, and progressive discipline, Defendant failed to follow its own policies and procedures in terminating Mr. Negrete and thus breached its express and implied contractual obligations with him.

Initial Joint Status Report and Provisional Discovery Plan, at 4-5.

Maloof Distributing  moved to dismiss Negrete's Complaint on May 22, 2006.  See Motion to Dismiss, filed May 22, 2006 (Doc. 4).  Maloof Distributing argued that the Court should dismiss Negrete's § 1981 claim for failing to exhaust with the Equal Employment Opportunity Commission and that the Court should decline to exercise supplementary jurisdiction over Negrete's remaining claims.  See Defendant's Memorandum in Support of Motion to Dismiss, filed May 22, 2006 (Doc. 5).  On October 17, 2006, the Court denied Maloof Distributing's Motion to Dismiss, because Negrete did not need to exhaust administrative remedies to seek relief under § 1981 in federal court.  See Memorandum Opinion and Order, filed Oct. 17, 2006 (Doc. 13).

Maloof Distributing answered Negrete's Complaint on November 17, 2006.  See Answer to Complaint for Employment Discrimination, Violation of 42 U.S.C. § 1981, Breach of Express Contract, Breach of Implied Contract, and Prima Facie Tort, filed Nov. 17, 2006 (Doc. 15).  Maloof Distributing served Negrete with its First Set of Interrogatories and Requests for Production on February 27, 2007.  See Certificate of Service, filed Feb. 27, 2007 (Doc. 18).  The following day, Negrete served Maloof Distributing with his First Set of Interrogatories and Requests for Production.  See Certificate of Service, filed Feb. 28, 2007 (Doc. 19).  On the same day that Negrete served Maloof Distributing  with his first discovery requests, Maloof Distributing served its initial disclosures on Negrete.  See Certificate of Service, filed Feb. 28, 2007 (Doc. 20).

On March 22, 2007, Maloof Distributing served its Answers and Responses to Negrete's First Set of Interrogatories and Requests for Production.  See Certificate of Service, filed Mar. 22,

2007 (Doc. 23).  On April 11, 2007, Negrete served Maloof Distributing his Answers to its First Set

of Interrogatories and  First Requests for Production.  See Certificate of Service, filed Apr. 11, 2007

(Doc. 24).

Negrete  served  his  second  Request  for  Production  of  Documents  on  June  11,  2007.

See Certificate of Service, filed June 11, 2007 (Doc. 33).  Maloof Distributing also submitted to

Negrete its second set of production requests.  See Certificate of Service, filed June 18, 2007 (Doc.

37).  Maloof Distributing responded to Negrete's second requests for production on July 10, 2007.

See Certificate of Service, filed July 10, 2007 (Doc. 38).  Maloof Distributing also supplemented

its initial disclosures to Negrete.  See Certificate of Service, filed July 12, 2007 (Doc. 39).

Pursuant to the Court's Scheduling Order, the termination date for discovery was set for July

16, 2007.  See Scheduling Order, at 1, filed May 2, 2007 (Doc. 27) ("This deadline shall be

construed to require that discovery be completed on or before the above date.")(emphasis in the

original).  "Pretrial motions, other than discovery motions, shall be filed with the Court and served

on opposing party by August 16, 2007."  Id. at 2.

Negrete took the depositions of two witnesses after the expiration of the discovery deadline

of July 16, 2007.  See Defendant Maloof Distributing, L.L.C.'s  Motion to Strike ¶ 2, at 1 filed Oct.

2, 2007 (Doc. 114).   One witness' deposition had been scheduled before the expiration of the

deadline, but the witness asked to reschedule the deposition.  See id.  ¶ 3, at 1.  The second witness,

Joe Samuels, could not be located by either party until August of 2007.   See id.

On August 13, 2007, Negrete's counsel emailed Maloof Distributing's counsel and asked

to identify two additional witnesses.  See id. ¶ 5, at 1.  Maloof Distributing was consulted and

opposed the disclosure of additional witnesses.  See id. ¶ 6, at 1.

On August 16, 2007, Maloof Distributing moved for summary judgment and requests that

the Court dismiss all Negrete's claims with prejudice.  See Defendant Maloof Distributing L.L.C.'s Motion for Summary Judgment ("Maloof Distributing summary judgment motion"), filed Aug. 16, 2007 (Doc. 44).  To that motion, Maloof Distributing attached a memorandum and exhibits.  See Maloof Distributing summary judgment motion, Defendant Maloof Distributing, L.L.C.'s Memorandum in Support of its Motion for Summary Judgment ("Maloof Distributing's Memo."), filed Aug. 16, 2007 (Doc. 44-2); Maloof Distributing summary judgment motion, Exhibits A through O.

On August 31, 2007, Negrete submitted an unopposed motion for extension of time, see Unopposed Motion to Extend Time to File a Response Memorandum in Opposition to Defendant's Motion for Summary Judgment, filed Aug. 31, 2007 (Doc. 46), which the Court granted.  See Stipulated Order Extending Time to File a Response Memorandum in Opposition to Defendant's Motion for Summary Judgment, filed Sept. 4, 2007 (Doc. 47).  The parties submitted a request to the Court that Negrete be allowed to exceed the twenty-four page limit set forth in D.N.M.LR-Civ. 7.7, and that Negrete be allowed to attach exhibit pages in excess of the fifty pages allowed pursuant to D.N.M.LR-Civ. 10.5.  See Stipulated Motion Relating to Page Numbers of Response Memorandum to Motion for Summary Judgment, filed Sept. 17, 2007 (Doc. 51).  The Court entered a stipulated order allowing Negrete to submit a response memorandum to Maloof Distributing's summary judgment motion that could be in excess of twenty-five pages, but not to exceed forty pages.  See Stipulated Order Allowing Plaintiff's Response Memorandum Brief in Opposition to Defendant's Memorandum in Support of its Motion for Summary Judgment, filed Sept. 25, 2007 (Doc. 111).

Negrete submitted his Response to Maloof Distributing's summary judgment motion on September 17, 2007.  See Plaintiff Jose Negrete's Response to "Defendant Maloof Distributing,

L.L.C.'s Motion for Summary Judgment ("Negrete's Response"), filed Sept. 17, 2007 (Doc. 52). Negrete also submitted a memorandum in support of his Response.  See Plaintiff Jose Negrete's Response Memorandum in Opposition to Defendant's Memorandum in Support of Its Motion ("Negrete's Response Memo."), filed Sept. 17, 2007 (Docs. 53-103).  Negrete also submitted exhibits in an appendix.  See Appendix, filed Sept. 19, 2007 (Docs. 106-109).  Negrete used an affidavit of one of the undisclosed witnesses to support his Response to Maloof Distributing's summary judgment motion. See id. ¶ 7, at 2; Negrete's Response, Exhibit 7, Affidavit of Eddie Montoya (executed Aug. 29, 2007) (Doc. 108-19).

Maloof Distributing replied to Negrete's Response on October 2, 2007.  See Defendant Maloof Distributing, L.L.C.'s Reply to Plaintiffs Response to Defendant's Motion for Summary Judgment ("Maloof Distributing's Reply"), filed Oct. 2, 2007 (Doc. 112).  On October 2, 2007, Maloof Distributing notified the Court that briefing was complete on Maloof Distributing's summary judgment motion. See Notice of Completion, filed Oct. 2, 2007 (Doc. 113).

Maloof Distributing contends that there is no dispute of material fact and summary judgment is appropriate as a matter of law on Negrete's claim of intentional discrimination under 42 U.S.C. § 1981, because Negrete does not put forth direct evidence that the management team stated, either in verbal or written format, that Negrete was being terminated because of his race.  See Maloof Distributing's Memo., at 11.  Maloof Distributing contends that Negrete's termination did not stem from an intentionally discriminatory decision made by supervisors.  See id. at 13.  Maloof Distributing argues that, because Samuels, a white employee, was terminated for the same incident that led to Negrete's termination, there is no inference of discrimination.  See id. at 14.

Maloof Distributing contends that Negrete had "a run-in with management because he failed to take a drug test when directly asked to do so by his supervisor, Leyva." Id. at 14.  Maloof

Distributing contends that Negrete was in violation of the Handbook, which states that, if an employee fails to provide a urine and/or blood sample within three hours of a request, it will be considered a voluntary resignation of that employee's employment.  See Maloof Distributing's Memo. at 14; Handbook at 22.  "Simply put, Leyva gave Negrete a break."  Maloof Distributing's Memo. at 14.  Maloof Distributing admits that there is "no testimony or documentation indicat[ing] the two employees' termination was related in any way to their previous indiscretions." Id. at 15.

Maloof Distributing contends that it can proffer a nondiscriminatory reason for Negrete's termination.  See id. at 16.  Maloof Distributing contends that Negrete was terminated for "not following company procedures and a pending investigation of embezzlement by the Clovis Police Department." Id. at 16.  Maloof Distributing contends that Negrete was terminated for violating state law and company policy.  See Maloof Distributing's Memo., at 17.

Maloof Distributing contends that Negrete is unable to establish pretext because its stated reasons for terminating Negrete were that Negrete violated company policy, and that the Handbook specifically provides that, if a company policy is violated, an employee could be subject to termination.  See Maloof Distributing's Memo. at 19; Handbook at 30.  Maloof Distributing contends that "[d]elivering un-invoiced beer is illegal and against both written and unwritten policy." Id. at 19.  Maloof Distributing argues that it is impossible for Negrete to show a nexus between the derogatory statements that James and Samuels made, and Maloof Distributing's decision to terminate Negrete, because James retired before the "Maloof management team made the decision to terminate Negrete." Id. at 20.  Maloof Distributing contends that the management team that made the decision to terminate Negrete included two Hispanics: Martinez and Leyva.  See id. at 20.

Lastly, Maloof Distributing contends that Negrete is unable to prove his breach of implied contract claim because there was no implied contract between itself and Negrete.  See id. at 9.

Maloof Distributing contends that Negrete signed the Maloof Acknowledgment, Drug Screening Acknowledgment, and the Handbook, which all state that these documents do not constitute an express nor implied contract.  See Maloof Distributing's Memo., at 9.  Maloof Distributing argues in the alternative, that even if the Court finds that a contract has been made, none of the documents guarantee Negretre a right to a job.  See id. at 10.  Maloof Distributing argues that it had no standard course of conduct establishing an implied contract, and, even if the Court finds that such a contract existed, Negrete was not damaged by the termination, because he enjoyed all the benefits, privileges, terms, and conditions of the contractual relationship with Maloof Distributing.  See id. at 11.

Negrete responds that Maloof Distributing failed to comply with local rules in its motion for summary judgment.  See Negrete's Response at 23.  Negrete contends that Maloof Distributing's Memorandum is defective because its references to depositions only reference a page number and do not refer the reader to specific line numbers.  See id. at 25.  He also contends that Maloof Distributing's exhibits D, E, G, I, J, K, M, N, O, and P of its Memorandum should be stricken as deficient under rule 56 of the Federal Rules of Civil Procedure.  See Negrete's Response, at 24.

Negrete contends that whether an implied contract existed between himself and Maloof Distributing is a question of fact that is best left for jury determination.  See id. at 26-29.  Negrete contends that there are disputed issues of material issues of fact between the parties regarding the effect of the Handbook on the employee relationship.  See Negrete's Response at 29.  He also contends that there are disputed issues of material fact between the parties regarding Maloof Distributing's policies and procedures regarding progressive discipline and good cause termination. See id. at 29.

Negrete contends that he has adduced direct evidence of discrimination because he represents that Russell told him to go back to Mexico.  See id. at 32.  Negrete contends that Bolin participated

in the decision to terminate Negrete, and was also present when racist and ethnic comments were made to Negrete, did nothing about these statements, and laughed at them.  See id. at 32-33. Negrete contends that he has established a prima facie case of discriminatory discharge.  See id. at 36.  Negrete contends that, even though Maloof Distributing fired Samuels at the same time as Negrete, Samuels had other workplace infractions.  See id. at 36.  Negrete also states that Faul, a white employee, was deemed a co-conspirator, but was not terminated.  See id. at 36.  He also contends that the person or persons who loaded the beer in Roswell without an invoice on December 17, 2004, were also not terminated.  See id. at 5.

Lastly, Negrete contends there are disputed issues of material fact regarding his claim for prima facie tort.  See id. at 38.  He contends that he has established intent to injure because Velarde falsely accused Negrete of actually removing beer from the company van into a pick-up truck.  See id. Negrete contends that Velarde observed Negrete leaving his home before the pick-up arrived and took the beer from the company van.  See id. at 39.

Maloof Distributing disputes Negrete's contention that it violated local rule 7-1(a), because it represents that its counsel and the counsel for plaintiff communicated many times about the summary judgment and that it was ascertained in advance that the plaintiff would oppose the motion. See Maloof Distributing's Reply at 2.  Maloof Distributing contends that it laid a proper foundation for the disputed exhibits that Negrete contends are inauthentic under business-records exception. See Maloof Distributing's Reply at 4.  Maloof Distributing also contends that it identified with specificity the record upon which it relied, because it made checkmarks next to the line numbers upon which it is was relying.  See Maloof Distributing's Reply at 4.

Maloof Distributing contends that it is entitled to judgment as a matter of law on Negrete's prima-facie tort claim.  See id. at 11.  Maloof Distributing contends that Negrete has no basis for

asserting a claim for prima-facie tort.  See id. at 11-12.  Maloof Distributing contends that, if

Velarde made a false statement to a police officer, that would be an act contrary to law under

N.M.S.A. 1978, § 30-39-1.  See Maloof Distributing's Reply at 12; N.M.S.A. 1978, § 30-39-1

(stating that "[i]t is unlawful for any person to intentionally make a report to a law enforcement

agency or official, which report he knows to be false at the time of making it, alleging a violation

by another person of the provisions of the Criminal Code. Any person violating the provisions of

this section is guilty of a misdemeanor.").  Maloof Distributing contends:

> Further, simply for argument's sake, if Mr. Velarde would admit (such an admission is strongly denied) to making such a statement, Defendant would assert that this statement can not form a basis for a claim for prima facie tort. Prima facie tort consists of an otherwise lawful act, committed with the intent to injure. Schmitz v. Smentowski, 109 N.M. 386, 785 P.2d 726 (1990). The allegation as made by Plaintiff that David Velarde made a false statement to a police officer is contrary to law, NMSA 1978, §3-25-1, and as such does not constitute a prima facie tort. The act performed must fall outside of other intentional tort categories. Schmitz v. Smentowski, 109 N.M. 386, 785 P.2d 726 (1990). Plaintiff's claim fails as a matter of law.

Maloof Distributing's Reply, at 12.

Also on October 2, 2007, Maloof Distributing moved to strike the affidavit of the

undisclosed witness from Negrete's Response to its motion for summary judgment and asked the

Court to prohibit the testimony of four potential witnesses.  See Defendant Maloof Distributing,

L.L.C.'s Motion to Strike ("Maloof Distributing's motion to strike"), filed Oct. 2, 2007 (Doc. 114).

Maloof Distributing objected to Negrete's Witness and Exhibit list that he filed identifying four

previously undisclosed witnesses:  Montoya, Franco, Rodriguez, and Opoza.  See id. ¶ 8, at 2;

Plaintiff's Witness and Exhibit List, at 2-3, filed Sept. 17, 2007 (Doc. 69).  Maloof Distributing also

argued that Negrete made new allegations of hostile-work environment which he had not previously

plead.  See Maloof Distributing's motion to strike ¶ 9, at 2; Negrete's Response, at 4, 6, 11, 13, 18-

21, 33-36.  Maloof Distributing's counsel represented that he attempted to obtain Negrete's position on this motion via email and telephone, but was unable to do so.  <u>See</u> Maloof Distributing's motion to strike ¶ 10, at 2.  Maloof Distributing also filed a memorandum in support of its motion to strike. <u>See</u> Defendant Maloof Distributing, L.L.C.'s Memorandum in Support of its Motion to Strike ("Maloof Distributing's motion to strike memo."), filed Oct. 2, 2007 (Doc. 114-2).

Negrete responded to Maloof Distributing's motion to strike on October 8, 2007.  <u>See</u> Plaintiff Jose Negrete's Response to "Defendant Maloof Distributing, L.L.C.'s Motion to Strike" ("Negrete's Response to motion to strike"), filed Oct. 8, 2007 (Doc. 115).  Negrete admitted that Maloof Distributing's allegations contained within paragraphs 1-7, 10, and 11, of its motion to strike were true.  <u>See</u> Negrete's Response to motion to strike ¶ 1, at 1.  Negrete admitted most of paragraph 3 of Maloof Distributing's motion to strike, but argued that he provided the address for Joe Samuel in July of 2007.  <u>See</u> Negrete's Response to motion to strike ¶ 2, at 1.  Paragraph 3 of Maloof Distributing's motion to strike stated: "The deposition of one of these witnesses had been scheduled prior to the expiration of the deadline, however, the witness asked to reschedule the deposition. The second witness, Joe Samuels had been identified, however, [he] could not be located by either party until August of 2007."  Maloof Distributing's motion to strike ¶ 3, at 1.  Negrete admitted paragraph 8 of Maloof Distributing's motion to strike, but argued that he provided the names of Montoya and Rodriguez before Maloof Distributing took Samuels' deposition on August 31, 2007.  <u>See</u> Negrete's Response to motion to strike ¶ 3, at 1.  Paragraph 8 of Maloof Distributing's motion to strike stated: "Plaintiff filed a Witness and Exhibit List identifying four (4) previously undisclosed witnesses; namely John Franco, Eddie Montoya, Randy Rodriguez, and Edmund Opoza."  Maloof Distributing motion to strike ¶ 8, at 2.  He argued that Maloof Distributing had an opportunity to depose Montoya and Rodriguez, but failed to do so.  <u>See</u> <u>id.</u>  Negrete contended that Franco was one of Maloof

Distributing's Roswell warehouse employees and, therefore, was well known to Maloof Distributing.  See id.  Negrete also contended that Opoza gave a statement to Clovis Police on behalf of Maloof Distributing on December 17, 2004, and is a current Maloof Distributing employee.  See id.  Negrete denied the allegations contained in paragraph 9 of  Maloof Distributing's motion to strike.  See id. ¶ 4, at 2.  Paragraph 9 of Maloof Distributing's motion to strike stated: "In support of his opposition to Defendant's Motion for Summary Judgment, Plaintiff made new allegation of hostile work environment, not previously plead[.]" Maloof Distributing's motion to strike ¶ 9, at 2.

Negrete contended that he "alleged hostile work environment in paragraph 16, 17, and 24 and the Initial Joint Status Report and Provisional Discovery Plan."  Id. Negrete argued that "the issue of racial discrimination in the work place was plead several times so as to put the Defendant on notice."  Plaintiff's Response Memorandum to "Defendant Maloof Distributing, L.L.C.'s Motion to Strike" ("Negrete's Response Memo."), filed Oct. 8, 2007 (Doc. 116).  Negrete contended that, because Lopez, Samuels, and he, all testified regarding the discriminatory environment at Maloof Distributing during their depositions, substantial discovery has occurred regarding hostile-work environment.  See id. at 6-7.

On November 14, 2007, the Court granted in part and denied in part Maloof Distributing's Motion to Strike. See Memorandum Opinion and Order, at 34, filed November 14, 2007 (Doc. 125). The Court did not strike Montoya's affidavit from Negrete's Response to Maloof Distributing's Motion for Summary Judgment.  See id.  The Court did not prohibit Montoya, Franco,  Rodriguez, and Opoza from testifying at trial.  See id.  The Court permitted Maloof Distributing  to take the depositions of Montoya, Franco, Rodriguez, and Opoza.  See id.  The Court also declined to permit Negrete to raise a new claim of hostile-work environment at trial or amend his complaint to include

it.[1]  See id.

The Court held a hearing on this matter on October 9, 2007.  Maloof Distributing admitted that it practices "progressive discipline."  Transcript of Hearing at 27:23-25 (October 9, 2007)("Tr.") (Mower).[2]  Maloof Distributing characterized "progressive discipline" as a practice where "employees are sometimes given chances rather than being terminated immediately for potential bad behavior."  Tr. at 28: 3-5 (Mower).  Maloof Distributing represented that "theft or dishonesty can be grounds for immediate termination."  Tr. at 28:9-10 (Mower).  Maloof Distributing contended, however, that there was no contract, express or implied, between it and Negrete because Negrete was an at-will employee.  See Tr. at 28:17-19 (Mower).  Maloof Distributing also contended that Negrete was a merchandiser, not a driver, see Tr. at 23:9-12, although it admits that there "were occasions before July of 2003, where Mr. Negrete in fact operated a vehicle because he had a CDL."

_____

[1] Dismissal of hostile-work environment claims that have not been properly exhausted is appropriate under Title VII.  See Carter v. Mineta, 125 Fed.Appx. 231, 238 (10th Cir. 2005)(affirming dismissal of hostile-environment claim where the plaintiff failed to list that claim in her initial EEOC complaint, and she also failed to describe a hostile work environment claim in the narrative portion of her complaint).  The Court has previously noted that Negrete would have to properly exhaust Title VII claims, but noted that Negrete was not bringing any Title VII claims. See Negrete v. Maloof Distributing L.L.C., No. CIV 06-0338 JB/LFG, 2006 WL 4061178 at ** 2-3, 5 (D.N.M. Oct. 17, 2006)(Browning, J.)("Negrete is not bringing a claim under Title VII. Instead, Negrete brings his claim under 42 U.S.C. § 1981. To the extent that Maloof Distributing is contending that there are necessary exhaustion prerequisites to filing a § 1981 complaint, and that Negrete's failure to exhaust his administrative remedies prevents the Court from having subject-matter jurisdiction, Congress has not required Negrete to exhaust his administrative remedies before bringing his civil rights action under § 1981."); Mitchell v. City and County of Denver, 112 Fed.Appx. 662, 668 (10th Cir. 2004) (noting that the plaintiff's "EEOC charge contain[ed] no factual allegations of treatment in manner or degree sufficient to allege a hostile work environment. Consequently, [the plaintiff's] Title VII hostile work environment claim (titled "racial harassment" in his civil complaint) [was properly] dismissed for failure to exhaust administrative remedies.").

[2] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Tr. at 23:12-14 (Mower).   Maloof Distributing contended that Negrete "was not only paid appropriately, he was in some instances paid more money than other merchandisers employed by Maloof at the time."  Tr. at 33:1-5 (Mower).  Maloof Distributing also contended that there is no connection between any alleged racist behavior by Samuels towards Negrete, and James' overhearing it, and the decision to terminate Negrete.  See Tr. at 34:1-5 (Mower).

Negrete contended that Bolin, supervisor of the Clovis facility, was present when Samuels made disparaging remarks to Negrete and laughed at those remarks.  See Tr. at 52:17-21 (Dixon). Negrete represented that James told him, if he would falsely confess to stealing beer, then James would get the charges dismissed and Negrete could keep his job.  See Tr. at 52:24-53:1 (Dixon). Negrete represented that he told James he would not do that, and then he lost his job.  See Tr. at 53:1-3 (Dixon). Negrete concedes that the discriminatory statements made by James were not in front of Bolin.  See Tr. at 61:14-17 (Dixon). Negrete  conceded that Montoya's affidavit was only important to his hostile-work environment claim, and did not have anything to do with Negrete's racial discrimination and termination claim.  See Tr. at 61:8-13 (Court & Negrete).  Negrete contends that James' statement to Negrete that he would get Negrete put in jail and get Negrete deported is direct evidence of discrimination in light of the discrimination that was occurring at Maloof Distributing.  See Tr. at 65:16-20 (Dixon).

Maloof Distributing represented that the decision to fire Negrete was made as a result of "an investigation on allegations of theft and he was fired for violating a company policy."  Tr. at 28:19-21 (Mower).  Negrete responded that Maloof Distributing's proffered reason for terminating him has changed over time.  See Tr. at 51:9-10 (Dixon).  Negrete contended that Maloof Distributing originally defended that it fired him for violating its March 1, 2004 Memorandum.  See Tr. at 14-16 (Dixon).   The March 1, 2004 Memorandum purported to prohibit delivery of beer without an

invoice.  See Tr. at 50:14-16 (Dixon).  Negrete contended, however, that delivery of beer without an invoice was the norm, not the exception at Maloof Distributing.  See Tr. at 19-21 (Dixon). Negrete argued that Maloof Distributing now contends that it fired Negrete for stealing beer.  See Tr. at 51:8-9 (Dixon).

Maloof Distributing acknowledged that the burden-shifting analysis in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), does not apply in a direct-evidence case.  See Tr. at 30:13-15 (Court & Mower). Maloof Distributing also conceded that Negrete is a member of a protected class. See Tr. at 31:13-14 (Mower).  Maloof Distributing further conceded that Negrete was performing his job satisfactorily.  See Tr. at 34:18-35:13 (Court & Mower).

Maloof Distributing admitted that Negrete and Samuels were treated very differently in how they were initially encountered regarding the "hot shot" beer in Negrete's truck.  See Tr. at 45:21-22 (Mower).  Maloof Distributing represented that this differential treatment was because its investigator, Velarde, confronted Negrete about who took the beer from the van, after allegedly seeing a person take the beer from the van, and Negrete denied any knowledge of that removal.  See Tr. at 45:24-46:2 (Mower).  Maloof Distributing represented that Velarde then called the police and seized the van.  See Tr. at 46:2-3 (Mower).  Maloof Distributing contended that the reason why the police were called for Negrete but not for Samuels is not part of any evidence in the record.  See Tr. at 46:5-7 (Mower).  Maloof Distributing represented that Russell traveled to Roswell and to Clovis, and decided to fire both Samuels and Negrete for the same conduct.  See Tr. at 46:9-10 (Mower).

Negrete contended that Samuels was in violation of Maloof Distributing policies, but was treated very differently than Negrete, despite he and Samuels being similarly situated.  See Tr. at 53:10-18 (Dixon).  Negrete contended that Samuels and Faul were both involved in the incident, but Faul was only demoted, not fired, and Maloof Distributing did no pursue criminal charges against

Faul or Samuels. <u>See</u> Tr. at 54:11-55:12 (Dixon & Court).  Negrete contended that he did not violate any company policies.  <u>See</u> Tr. at 56:8-10 (Dixon).  Negrete contended that "taking beer from one company truck and putting it in another company truck is not a violation of policy."  Tr. at 56:10-12 (Dixon).  Negrete also contended that he did not violate the March 1, 2004 Memorandum, because it only said that an employee could not deliver beer without an invoice, but said nothing about having beer in a company vehicle without an invoice.  <u>See</u> Tr. at 58:21-25 (Dixon).  Negrete represents that it was common for beer to be in Maloof Distributing vehicles without an invoice. <u>See</u> Tr. at 58:25 (Dixon).  Negrete contends that delivery without a computer generated invoice was common and widespread at Maloof Distributing.  <u>See</u> Tr. at 60:5-12 (Dixon).

Maloof Distributing contended that New Mexico Uniform Jury Instruction 13-1631 states the elements of prima facie tort.  <u>See</u> Tr. at 48:10-12 (Mower).  Maloof Distributing denied Negrete's contention that Velarde made a statement to the Clovis Police Department that he saw Negrete load beer from his van into the pick-up truck of an unknown person.  <u>See</u> Tr. at 48:23-49:4 (Mower).  Maloof Distributing contended that, even if Velarde made a false statement to police officers contrary to law, that is not a prima facie tort.  <u>See</u> Tr. at 49:18-20 (Mower). Negrete contended that Velarde's statement to the police that he saw Negrete load beer from the van into a pick-up truck was "the type of conduct that the prima facie tort is designed for" and that there are material facts in dispute on that claim.  Tr. at 63:6-12 (Dixon).

The Court held a pretrial conference on October 31, 2007.  The trial has a firm setting for December 3-7, 2007 in Roswell, New Mexico.

## <u>LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENTS</u>

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant has "the initial burden to show that there is an absence of evidence to support the nonmoving party's case." Mirzai v. State of New Mexico General Servs. Dep't, 506 F.Supp.2d 767, 774 (D.N.M. 2007)(Browning, J.)(internal quotations omitted).  That is, the moving party has the initial burden to demonstrate absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   If the movant meets that burden, then the burden shifts to the nonmovant "to present specific, admissible facts from which a rational trier of fact could find for the nonmovant." Velasquez v. Frontier Medical, Inc., 375 F.Supp.2d 1253, 1262 (D.N.M. 2005)(Browning J.).  The nonmovant must set forth specific facts and cannot rely only on his pleadings.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." Id.

"For the purposes of summary judgment, the court assumes the evidence of the nonmoving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor."  Velasquez v. Frontier Medical, Inc., 375 F.Supp.2d at 1263 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  Summary judgment is appropriate if there is no genuine issue of material fact.  See Trujillo v. Bd. of Educ., Albuquerque Public Schools, 410 F.Supp.2d 1033, 1039 (D.N.M. 2005)(Browning, J.).  "An issue of fact is 'genuine' if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). "Essentially, the inquiry is whether the evidence presents a sufficient disagreement to require

-38-

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

Velasquez v. Frontier Medical, Inc., 375 F.Supp.2d at 1263 (internal quotations and citations

omitted).

## LAW ON DISCRIMINATION AND SUMMARY JUDGMENT

The plaintiff bears the burden of proving discrimination.  See Kelly v. City of Albuquerque,

375 F.Supp.2d 1183, 1210 (D.N.M. 2004)(Browning, J.). A plaintiff can prove discrimination either

by direct evidence, see Aramburu v. The Boeing Co., 112 F.3d 1398, 1407 (10th Cir. 1997), "or by

indirect proof under the analytical framework that the Supreme Court of the United States set forth

in McDonnell Douglas Corp. v. Green." Kelly v. City of Albuquerque, 375 F.Supp.2d at 1210 (citing

McDonnell Douglas Corp. v. Green, 411 U.S. at 802-804.

### A.     DIRECT EVIDENCE.

"When a plaintiff alleges that discriminatory comments constitute direct evidence of

discrimination, [the Tenth Circuit] has held that the plaintiff 'must demonstrate a nexus exists

between the alleged discriminatory statements and the . . .  decision to terminate her.'"  Perry v.

Woodward, 199 F.3d 1126, 1134 (10th Cir. 1999)(quoting Cone v. Longmont United Hosp. Ass'n,

14 F.3d 526, 531 (10th Cir. 1994)).   "Direct evidence demonstrates on its face that the employment

decision was reached for discriminatory reasons." Danville v. Regional Lab. Corp., 292 F.3d 1246,

1249 (10th Cir. 2002).  See Perry v. Woodward, 199 F.3d at 1134 (holding that a defendant's

isolated, disparaging comments made to and about Hispanics in general and Hispanic employees

of the County Clerk's office in particular were not direct evidence of discrimination because there

was no evidence that any of the defendant's comments were intended to directly describe the

plaintiff and plaintiff failed to demonstrate a causal nexus between the defendant's racist comments

and her discharge.).  "Direct evidence is that which demonstrates a specific link between the alleged

-39-

discriminatory animus and the challenged [employment] decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated [the employer's] decision to take the adverse employment action." Deneen v. Northwest Airlines, 132 F.3d 431, 436 (8th Cir. 1998).

## B.   **McDONNELL DOUGLAS** ANALYSIS.

The McDonnell Douglas Corp. v. Green analysis applies to "claims of age, race, national origin, gender discrimination, and retaliation are all subject to the burden shifting framework that the Supreme Court established in McDonnell Douglas Corp. v. Green." Gamez v. Country Cottage Care & Rehab., 377 F.Supp.2d 1103, 1119 (D.N.M. 2005)(Browning, J.)(citing McDonnell Douglas Corp. v. Green, 411 U.S. at 802-804). Under McDonnell Douglas Corp. v. Green, a plaintiff must set forth a prima facie case of discrimination. See Kelly v. City of Albuquerque, 375 F.Supp.2d at 1210. If the plaintiff establishes a prima facie case for any of his discrimination claims, "the burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its employment related decision." McDonnell Douglas Corp. v. Green, 411 U.S. at 802.

"Upon the employer's articulation of a legitimate, nondiscriminatory reason[ ], the presumption of discrimination established by the prima facie case simply drops out of the picture." Kelly v. City of Albuquerque, 375 F.Supp.2d at 1210 (internal quotations omitted). The plaintiff then must present evidence that the defendant's proffered reason for the employment decision was pretextual. See id. (citing Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgon v. Hilti, Inc., 108 F.3d 1319, 1323 (10th

Cir. 1997)(internal quotations omitted).

A plaintiff's mere conjecture that his employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.  See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).  A plaintiff typically shows pretext in one of three ways:

> [i] with evidence that the defendant's stated reason for the adverse employment action was false; [ii] with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or [iii] with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.

Green v. New Mexico, 420 F.3d 1189, 1193 (10th Cir. 2005).  "The plaintiff is not required to present evidence of actual discrimination to establish pretext, because '[e]vidence tending to show pretext permits an inference that the employer acted for discriminatory reasons.'"  Mirzai v. State of New Mexico General Servs. Dep't, 506 F.Supp.2d 767, 776 (D.N.M. 2007)(Browning, J.).

"'[T]he pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine or pretextual.'" Falcon v. Trustees of the State Colleges in Colorado, 216 F.3d 1087 (Table), 2000 WL 779860, at *4 (10th Cir. 2000)(quoting Hardy v. S.F. Phosphates L.C., 185 F.3d 1076, 1080 (10th Cir. 1999)). "A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently than other similarly-situated employees who violated work rules of comparable seriousness." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).  A plaintiff cannot, however, be forced to pursue any particular means of demonstrating a defendant's proffered nondiscriminatory

reason is pretextual.  See id. A plaintiff is not required to introduce sufficient evidence to find both that the employer's reasons are false and the real reason is discrimination.  See Guyton v. Ottawa Truck Division, Kalmar Industries U.S.A., Inc., 15 Fed.Appx. 571, 577 (10th Cir. 2001).

The plaintiff has an obligation to provide sufficient evidence to disbelieve the employer's legitimate, nondiscriminatory reason for terminating him.  See id.  The relevant inquiry is not whether the employer's proffered nondiscriminatory reasons "were wise, fair, or correct" but whether the employer "honestly believed those reasons and acted in good faith upon those beliefs."  Id. (internal quotations omitted).  "[A] mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1231. See English v. Colorado Dep't of Corr., 248 F.3d 1002, 1010 (10th Cir. 2001)(finding that there was no pretext where the plaintiff submitted affidavits that contended the supervisor was more critical of minority employees than white employees, and allegedly failed to investigate reports of racial epithets, because the plaintiff failed to show some nexus between that circumstantial evidence and the supervisor's decision to terminate him because "isolated, racist remarks by co-workers are insufficient to carry this burden.").

"Other circuits have recognized that a defendant may be held liable if the manager who discharged the plaintiff merely acted as a rubber stamp, or the 'cat's paw,' for a subordinate employee's prejudice, even if the manager lacked discriminatory intent."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1231 (citing Long v. Eastfield College, 88 F.3d 300, 307 (5th Cir. 1996); Kientzky v. McDonnell Douglas Corp., 990 F.2d 1051, 1057 (8th Cir. 1993); Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990)).  "In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decision-making power, uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment

action." E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d 476, 484 (10th Cir. 2006), cert. dismissed, --- U.S. ---, 127 S.Ct. 1931 (2007).  "The 'rubber stamp' doctrine . . . refers to a situation in which a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate."  Id.

In Kendrick v. Penske Transp. Servs., Inc., the plaintiff did not "argue that [the supervisor] was merely a rubber stamp or conduit for an employment decision made in reality by underlings." 220 F.3d at 1231.  "In the Tenth Circuit, a plaintiff may not recover under [the cat's paw] theory without showing that the decision maker followed the biased recommendation [of a subordinate] without independently investigating the complaint against the employee."  Natay v. Murray Sch. Dist., 119 Fed.Appx. 259, 262 (10th Cir. 2005)(internal quotations omitted).  "An important factor is whether, during the course of the investigation, the decision maker allows the claimant to give his version of events."  Id.

"A cat's paw claim cannot be maintained when the ultimate decision maker conducted an independent investigation and also allowed the plaintiff a chance to respond directly to the reasons for the decision."  Id.  On the other hand, A plaintiff must demonstrate that "the biased subordinate's discriminatory reports, recommendation, or other action caused the adverse employment action." E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 487.  See Young v. Dillon Companies, Inc., 468 F.3d 1243, 1253 (10th Cir. 2006)("[A] plaintiff must show that the allegedly biased investigator's discriminatory reports, recommendation, or other actions were the proximate cause of the adverse employment action."); E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 491 (finding pretext where supervisor with alleged racist bias had investigative role in disciplinary process and the decision maker relied exclusively on that supervisor's account of events in making her decision to terminate the plaintiff and where she did not conduct an independent

inquiry into the events that took place and failed to even ask the plaintiff his side of the story.").

### C.    PRIMA FACIE CASE OF DISCRIMINATORY DISCHARGE.

A plaintiff must demonstrate four elements to establish a prima facie case of discriminatory discharge: (i) he belongs to a protected class; (ii) he was qualified for his job; (iii) despite his qualifications, he was discharged, and (iv) the job was not eliminated after his discharge.  See Perry v. Woodward, 199 F.3d 1126, 1138 (10th Cir. 1999).  The Tenth Circuit has held that the plaintiff meets the fourth prong of the prima facie test "if the discharged plaintiff can show that someone was hired to replace [him]."  Id. "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1227 (internal quotations omitted).  The court's "role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1233 (quoting Simms v. Okla. ex rel. Dep't of Mental Health and Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir. 1999).  See English v. Colorado Dep't of Corr., 248 F.3d at 1008 (concluding the plaintiff satisfied prong number four of the prima facie case for discriminatory discharge -- that his job was not eliminated after his discharge -- although neither party raised evidence tending to show whether the plaintiff's position was eliminated after his discharge because there was sufficient evidence in the record to demonstrate that the plaintiff was not terminated because of a workplace reduction when the employer-defendant's stated reason for firing the plaintiff was that the plaintiff had violated Department of Correction rules by engaging in a sexual relationship with an inmate).

### D.    PRIMA FACIE CASE OF DISPARATE TREATMENT.

A plaintiff must demonstrate that: (i) he is a member of a protected class; (ii) he suffered an

adverse employment action, and (iii) similarly situated employees were treated differently.  See Velasquez v. Frontier Medical Inc., 375 F.Supp.2d at 1271.  "'A claim of disparate treatment encompasses a situation where the employer simply treats some people less favorably than others because of their race, color, religion, or national origin." Id. (quoting Mitchell v. City and County of Denver, 112 Fed.Appx. 662, 670 (10th Cir. 2004).  "To assert a claim of disparate treatment, the plaintiff must show that he was treated differently than other similarly situated employees who violated work rules of comparable seriousness."  Aramburu v. The Boeing Company, 112 F.3d at 1403.

"Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."  Id. (internal quotations omitted).  A court should compare "the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated."  Id.  (citing David v. City and County of Denver, 101 F.3d 1344, 1359-60 (10th Cir. 1996)).  "When comparing the relative treatment of similarly situated minority and non-minority employees, the comparison need not be based on identical violations of identical work rules; the violations need only be of comparable seriousness." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1233 (quoting Elmore v. Capstan, Inc., 58 F.3d 525, 530 (10th Cir. 1995)).

### E.    ADVERSE EMPLOYMENT ACTION.

"An adverse employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Whitaker v. San Jon Schools, No. CIV 04-1237 JB/WDS, 2006 WL 1308234, at *7 (D.N.M. April 19, 2006)(Browning, J.).  "Adverse employment

action includes significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir. 2007)(internal quotations omitted). "Conduct rises to the level of adverse employment action when it constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Stinnett v. Safeway, Inc., 337 F.3d 1213, 1217 (10th Cir. 2003)(internal quotations omitted).

### NEW MEXICO LAW REGARDING EMPLOYMENT CONTRACT

Under New Mexico law, unless there is an explicit contract of employment stating otherwise, employment is terminable at will. See Sanchez v. The New Mexican, 106 N.M. 76, 78, 738 P.2d 1321, 1323 (1987)("[U]nless there is an explicit contract of employment stating otherwise, employment is terminable 'at will,' . . . ."). "New Mexico recognizes two exceptions to this general rule, however: wrongful discharge in violation of public policy (retaliatory discharge), and an implied contract term that restricts the employer's power to discharge." Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 10, 918 P.2d 7, 10 (internal quotations omitted). The Supreme Court of New Mexico has explained that "whether an implied contract exists is a question of fact, and it may be 'found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct.'" Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 10, 918 P.2d at 10 (quoting Newberry v. Allied Stores, Inc., 108 N.M. at 427, 773 P.2d at 1234). In Lukoski v. Sandia Indian Management Co., 106 N.M. 664, 748 P.2d 507 (1988), the Supreme Court of New Mexico clarified

We do not mean to imply that all personnel manual will become part of employment

contracts.  Employers are certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason.  Such actions instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual.  However, if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it.  Having announced a policy, the employer may not treat it as illusionary.

106 N.M. at 666-67, 748 P.2d at 509-510 (internal quotations omitted).

In addition to any express employment contract that might govern an employer-employee relationship, under New Mexico law, "a personnel manual gives rise to an implied contract if it controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outlined." Cockerel v. Bd. of Regents of N.M. State Univ., 2002-NMSC-009, ¶ 26, 45 P.3d 876, 887 (quoting Newberry v. Allied Stores, Inc., 108 N.M. 424, 427, 773 P.2d 1231, 1234 (1989))(emphasis added).  For a personnel manual to create contractual rights, however,  its terms "must be sufficiently explicit to create a reasonable expectation of an implied contract." Trujillo v. N. Rio Arariba Elec. Coop., Inc., 2002-NCSC-004, ¶ 22, 41 P.3d 333, 342 (emphasis added).

"An employer's representations which give rise to a reasonable expectation that employees will be terminated only for good cause, may create an implied contract." Kiedrowski v. Citizens Bank, 119 N.M. 572, 575, 893 P.2d 468, 471 (Ct. App. 1995).  "The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation of conduct relied upon." Hartbarger v. Frank Paxton Co., 115 N.M. 665, 673, 857 P.2d 776, 784 (1993). "If the representations are sufficiently explicit, a jury may find that a contract is implied in fact to restrict the absolute power of the employer to discharge at will." Id. (internal quotations omitted).  Before a party's "expectations can be reasonable, they must satisfy a certain threshold of objectivity." Id.

-47-

The Court of Appeals of New Mexico held summary judgment was inappropriate where the employee handbook "contained detailed disciplinary procedures . . . .[requiring] managers to respond with progressive discipline, in a gradually escalating fashion, first with an oral warning, then a written warning, written probation, suspension, and finally, termination." Id. at 576, 893 P.2d at 472.  The Court of Appeals of New Mexico found that:

> the [employer's] systematic application of its termination policies could reasonably create an expectation in Plaintiff that the same would be done in her case.  There is at least a genuine issue of material fact, for resolution by the jury, as to whether the [employer's] handbook, combined with the [employer's] actual practices and representations, created an expectation of an implied-in-fact contract term limiting the employer's right to terminate at will.

Id. (internal quotations omitted).  The employee handbook in Kiedrowski v. Citizens Bank provided that: "It should be clearly understood that the policies described herein are not to be construed, in any manner whatsoever, as establishing any relationship between [the employer] and any of its employees.  Either the employee or the [employer] may exercise the option to terminate the employment relationship at any time and for any reason." Id. at 470, 893 P.2d at 574.  "To support the existence of an implied contract, an oral representation must be sufficiently explicit and definite." Gormley v. Coca-Cola Enterprises, 2004-NMCA-021, ¶ 20, 85 P.3d 252, 259.  "A factual showing of additional consideration or mutual assent to the terms of the implied contract is not required." Id.  "The question of whether an employment relationship has been modified is a question of fact." Hartbarger v. Frank Paxton Co., 115 N.M. at 670, 857 P.2d at 781.

## NEW MEXICO LAW REGARDING PRIMA FACIE TORT

"Prima facie tort provides  a remedy for persons harmed by intentional and malicious acts that are otherwise lawful, but fall outside of the rigid traditional intentional tort categories." Portales Nat'l Bank v. Ribble, 2003-NMCA-093, ¶ 4, 75 P.3d 838, 840(emphasis added).  See Healthsource

v. X-Ray Associates of N.M., 2005-NMCA-097, ¶ 34, 116 P.3d 861, 871 ("To state a claim for

prima facie tort a plaintiff must allege [i] an intentional and <u>lawful act</u> . . . .")(emphasis added);

<u>Grover v. Stechel</u>, 2002-NMCA-049, ¶ 19, 45 P.3d 80, 85 ("Prima facie tort exists only when the

defendant's acts meet the following elements: [i] an intentional, <u>lawful act</u> . . . .")(emphasis added).

New Mexico Uniform Jury Instruction 13-1631, "Definition and Elements of Prima Facie Tort"

provides:

> Plaintiff claims damages on the basis that defendant intended to cause plaintiff harm
> and succeeded in doing so. In order to recover damages from defendant on this
> claim, plaintiff must show:
>
> 1. That defendant intentionally [did some act] [failed to act];
>
> 2. That defendant intended that the [act] [failure to act] would cause harm to the
> plaintiff or that defendant knew with certainty that the [act] [failure to act] would
> cause harm to the plaintiff;
>
> 3. That the defendant's [act] [failure to act] was a cause of plaintiff's harm; and
>
> 4. That defendant's conduct was not justifiable under all the circumstances.

UJI Civ. 13-1631.  The Supreme Court of New Mexico first recognized prima facie tort as a cause

of action in <u>Schmitz v. Smentowski</u>, 109 N.M. 386, 394, 785 P.2d 726, 734 (1990).  The Supreme

Court of New Mexico held that the tortious act "must be committed with the intent to injure the

plaintiff, or, in other words, without justification, but it need not be shown that the act was solely

intended to injure plaintiff."  <u>Schmitz v. Smentowski</u>, 109 N.M. at 395, 785 P.2d at 736.

   Once intent to injure has been established, then the trial court must balance the defendant's

act or acts against the justification for the act or acts and the severity of the injury.  See <u>Portales Nat'l</u>

<u>Bank v. Ribble</u>, 2003-NMCA-093, ¶ 4, 75 P.3d 838, 840. The trial court "weigh[s]: [i] the injury;

[ii] the culpable character of the conduct; and [iii] whether the conduct is unjustifiable under the

circumstances."  <u>Hagebak v. Stone</u>, 2003-NMCA-007, ¶ 23, 61 P.3d 201, 208 (citing <u>Schmitz v.</u>

Smentowski, 109 N.M. at 394, 785 P.2d at 734)."Prima facie tort was not intended to provide a remedy for every intentionally caused harm." Lexington Ins. Co. v. Rummel, 1997-NMSC-043, ¶ 11, 945 P.2d 992, 995.  "Although prima facie tort is not to become a catch-all alternative for every action that cannot stand on its own legs . . . [the New Mexico Court of Appeals] has been willing to recognize a prima facie tort claim, even though the conduct in question bore a resemblance to another cause of action." Hagebak v. Stone, 2003-NMCA-007, ¶ 27, 61 P.3d at 209 (internal quotations omitted).  "[T]here is simply no need to resort to prima facie tort" when a plaintiff has "existing causes of action provid[ing] reasonable avenues to a remedy for the asserted wrongful conduct." Bogle v. Summit Investment Co., L.L.C., 2005-NMCA-024, ¶ 24, 107 P.3d 520, 529.

"Plaintiffs bear a heavy burden to establish intent to injure." Lexington Ins. Co. v. Rummel, 1997-NMSC-043, ¶ 12, 945 P.2d at 995. "The plaintiff must produce more than a showing that the injury is a natural and foreseeable consequence of the act." Id. ¶ 13, 945 P.2d at 995.  "[M]ere insensitivity" towards the injured plaintiff is insufficient to demonstrate intent to injure. Lexington Ins. Co. v. Rummel, 1997-NMSC-043, at ¶ 14, 945 P.2d at 995.  See id. ¶¶ 15, 16, 945 P.2d at 996 (holding that the plaintiff failed to demonstrate a material question whether the defendant intended to injury it, when the plaintiff's factual allegations indicated that the defendant "was motivated by the legitimate business purpose of reducing its own liability and the liability of its insured in the face of an enormous judgment, rather than by an intent to injure [the plaintiff]."); Hagebak v. Stone, 2003-NMCA-007, ¶ 28-29, 61 P.3d at 209 (holding it was error to grant summary judgment "merely on the basis of the same alleged conduct" between the plaintiff's defamation claim and prima facie tort claim because the plaintiff was "entitled to a reasonable opportunity to marshall sufficient evidence to prove his case.")(internal quotations omitted); Silverman v. Progressive Broadcasting, Inc., 1998-NMCA-107, ¶ 39, 964 P.2d 61, 72 (holding that the plaintiff failed to present a material

fact that a defendant acted with malicious intent when it protested the size of its logo on the billboards, because it appeared that the defendants were motivated by a legitimate business interest when they objected).

A plaintiff may not advance a claim for wrongful termination of an at-will employment "under the guise of prima facie tort," because that "would emasculate the doctrine of employment terminable at will." E.E.O.C. v. MTS Corp., 937 F.Supp. 1503, 1516 (D.N.M. 1996). See id. (holding that prima facie tort should not be extended to provide a remedy to the employment-at-will doctrine where the plaintiff contended the defendants-employers intentionally injured him by not allowing him to return to his home base salon and refused to extend the plaintiff's leave of absence by 30 days, that the defendants intended to, or at least knew such acts would cause the plaintiff harm, that these acts caused the plaintiff harm, and that there was no justification for the defendants' behavior); Yeitrakis v. Schering-Plough Corp., 804 F.Supp. 238, 249 (D.N.M. 1992)("There may be some indication that the New Mexico legislature, in giving effect to its proclaimed interest in greater job security, might be inclined to modify the at will doctrine. But, to date, it has not addressed the matter and it is not for this Court to engage in piecemeal judicial tinkering in an area so peculiarly suited to comprehensive legislative consideration. Thus, in New Mexico, the at will doctrine continues to permit termination for reasons other than those specifically proscribed and those that do not fall within one of the two narrow exceptions previously discussed . . . The Court therefore concludes . . .  that prima facie tort is unavailable to remedy the termination of an at will employee, even where he is terminated for bad cause.").

A plaintiff also has no claim in prima facie tort for intentional discrimination. See Silverman v. Progressive Broadcasting, Inc., 1998-NMCA-107, ¶ 36, 964 P.2d at 71.  "Intentional acts by reason of sexual harassment and sexual discrimination are unlawful acts and thus not actionable, as

a matter of law, under the prima facie tort theory."  Id. (internal quotations omitted).  In Silverman v. Progressive Broadcasting, Inc., 1998-NMCA-107, 964 P.2d 61, the New Mexico Court of Appeals held that the trial court properly dismissed the plaintiff's prima facie tort claim against defendants because she contended that the defendants had committed a prima facie tort by intentionally discriminating against her on the basis of sex.  See id. ¶ 36, 964 P.2d at 71.

Summary judgment may be inappropriate on a prima facie tort claim if there is a sufficient showing by the plaintiff that the defendant engaged in a legal act with intent to harm him or her, and the defendant's conduct did not otherwise fit into a tort claim.  In Portales Nat'l Bank v. Ribble, 2003-NMCA-093, 75 P.3d 838, the New Mexico Court of Appeals held that summary judgment was inappropriate where the plaintiffs argued that their Bank, through its president, engaged in a course of inappropriate conduct that resulted in indebtedness so that its president could eventually obtain control of the plaintiff's ranch: "[P]rima facie tort is an appropriate claim to bring . . . because the claim alleges intent to harm [the plaintiffs] through otherwise legal behavior, and the claim does not fit into an accepted category of tort."  Id. ¶ 6, 12, 75 P.3d at 840, 842.  In Tarin's, Inc. v. Tinley, 2000-NMCA-048, 3 P.3d 680, the New Mexico Court of Appeals held that an issue of material fact existed whether defendant committed a prima facie tort when building owner alleged that its former landlord, general contractor, and subcontractor improperly connected the owner's building to the former landlord's gas pipes and electrical lines when the owner's business moved to its new location, and that the owner suffered losses from the interruption of its business when former landlord revoked owner's alleged license to make the utility connections.  See id. ¶ 24, 3 P.3d 680-81, 689.

## ANALYSIS

Maloof Distributing is not entitled to summary judgment on Negrete's discimination claims, because there is a genuine issue of material fact regarding his discharge.  Negrete makes a prima

facie showing of discriminatory discharge and disparate treatment. Maloof Distributing has presented genuine non-discriminatory reason for its discharge of Negrete, but Negrete was terminated under circumstances giving rise to an inference of discrimination because there is a genuine issue of fact regarding Maloof Distributing's company policy regarding "hot shot" delivery. Maloof Distributing is not entitled to summary judgment on Negrete's implied contract claim because there is an issue of material fact whether the employment relationship between Negrete and Maloof Distributing was altered by representations made by Maloof Distributing supervisors. Maloof Distributing is entitled to summary judgment on Negrete's prima-facie tort claim, because either Velarde's actions were not legal, or Negrete is unable to demonstrate that Maloof Distributing and/or Velarde intended to injure him.

## I.   MALOOF DISTRIBUTING IS NOT ENTITLED TO SUMMARY JUDGMENT ON NEGRETE'S § 1981 DISCRIMINATION CLAIM.

For both the discriminatory discharge and disparate treatment claims, to meet his burden, Negrete must satisfy the <u>McDonnell Douglas Corp. v. Green</u> framework. Accordingly, Negrete must first set forth a prima facie case of discriminatory discharge and disparate treatment, at which point the burden shifts to Maloof Distributing to articulate a legitimate, nondiscriminatory reason. The burden then shifts back to Negrete to show that the proffered nondiscriminatory reason is pretext. Because Negrete has met his burden under the <u>McDonnell Douglas</u> analysis, the Court will deny summary judgment on Negrete's discrimination claim.

### A.   NEGRETE HAS NOT ESTABLISHED DIRECT EVIDENCE OF DISCRIMINATION.

Negrete contends that he has established direct evidence of Maloof Distributing's discrimination against him. Negrete contends that Russell pointed his finger at Negrete's face and told him that, if he would not "confess" to stealing the beer, Russell "was going to do everything

in his power to have [Negrete] convicted and sent back to Mexico."  Negrete Aff. ¶ 37, at 9.  Russell

testified that he does not recall making that statement.  See Russell Depo. at 16:16-19.  Leyva

testified he did not recall Russell telling Negrete that statement.  See Leyva Depo. at 13:18-14:1.

Bolin testified that Russell did not make that statement to Negrete.  See Bolin Depo. at 33:23-34:2.

Direct evidence "demonstrates on its face that the employment decision was reached for

discriminatory reasons."   Danville v. Regional Lab. Corp., 292 F.3d at 1249.  Negrete must

demonstrate a direct link between Russell's purported comments and his discharge.  See Perry v.

Woodward, 199 F.3d at 1134.  Negrete's representation about Russell's comment made to him about

the beer is insufficient "to support a finding by a reasonable fact finder that an illegitimate criterion

actually motivated [the employer's] decision to take the adverse employment action."  Deneen v.

Northwest Airlines, 132 F.3d 431, 436 (8th Cir. 1998).  Assuming that the representation was made,

as the Court must, it does not indicate that Russell terminated Negrete because of his race or national

origin.

### B.   NEGRETE HAS ESTABLISHED A PRIMA FACIE CASE OF DISCRIMINATORY DISCHARGE.

Maloof Distributing does not seriously dispute that Negrete has made out a prima facie case

of discriminatory discharge.  Negrete belongs to a protected class, and it is undisputed that Negrete

was qualified for his job.  Moreover, there is evidence that Negrete was performing his job

satisfactorily when he was terminated.

### 1.   Negrete Belongs to a Protected Class.

The parties agree that Negrete belongs to a protected class. He is Hispanic.  See Complaint

¶ 1, at 1; Answer Tr. at 31:13-14 (Mower);  Mirzai v. State of New Mexico General Services Dept.,

506 F.Supp.2d at 781 (holding that the plaintiff was a member of a protected class as a person of

-54-

Persian descent, where the defendant did not argue that the plaintiff was not a member of a protected class).

### 2.   There is Evidence that Negrete was Qualified for His Job and Performing it Satisfactorily.

The parties agree that Negrete was qualified for his job and was performing it satisfactorily. See Leyva Depo. at 24:20-21, 26:19-23 (testifying that Negrete was a fair employee and, to Leyva's knowledge, had never been coached by anyone); Faul Depo. at 16:21-17:4 (testifying that Faul never had any problems with Negrete's work performance and classifying him as a good, honest, and hardworking employee); Lopez Depo. at 61:5-13 (agreeing that Negrete was a good employee, had a good attitude, was a hard worker, and honest).

### 3.   Despite his Qualifications and Satisfactory Performance, Negrete was Discharged.

Negrete was discharged on December 20, 2007.  See Action Form; Russell Depo. at 20:2-8. Russell admitted that part of the reason he terminated Negrete was that, in his opinion, Negrete had stolen or embezzled beer from Maloof Distributing.  See Russell Depo. at 35:2-7.

### 4.   Negrete's Job was not Eliminated After his Discharge.

There is sufficient evidence in the record to find that Negrete was not terminated because of a workplace reduction, because like the parties in English v. Colorado Dep't of Corr., neither party has adduced evidence to show whether Negrete's position was eliminated after his discharge, but Maloof Distributing has contended it fired Negrete because he violated a company policy by having uninvoiced beer in his company van.  See Tr. at 28:19-21 (Mower) (representing that Maloof Distributing fired Negrete for violating a company policy); English v. Colorado Dep't of Corr., 248 F.3d at 1008 (concluding there was sufficient evidence in the record to find that the plaintiff was not terminated because of a workplace reduction, where neither party raised evidence tending to show

whether the plaintiff's position was eliminated after his discharge, but the employer-defendant's stated reason for firing the plaintiff was that the plaintiff had violated Department of Correction rules by engaging in a sexual relationship with an inmate).  Although there is some dispute between the parties regarding what Negrete's job was at Maloof Distributing, no party has argued that Negrete was discharged because of workplace reduction.  See Negrete Aff. ¶ 8, at 2 (contending that he was a driver for Maloof Distributing); Leyva Depo. at 23:3-5 (characterizing Negrete as a merchandiser driver assistant); Bolin Depo. at 64:10-11 (characterizing Negrete as a driver/helper merchandiser).

### C.   NEGRETE HAS ESTABLISHED A PRIMA FACIE CASE OF DISPARATE TREATMENT.

Maloof Distributing does not seriously dispute that Negrete has produced sufficient evidence to establish a prima facie case of disparate treatment.  While Negrete could have done a better job of establishing some of the details of employment for the employees which he contends are similarly situated, drawing all reasonable inferences in favor of Negrete, the non-moving party, there is a genuine issue of fact regarding whether Maloof Distributing treated similarly situated employees differently.  The primary issue is there is a genuine issue of fact that the legitimate, nondiscriminatory reason which Maloof Distributing advances for the discharge is pretextual.

#### 1.   Negrete Belongs to a Protected Class.

The parties agree that Negrete belongs to a protected class.  See Tr. at 31:13-14 (Mower).

#### 2.   Negrete Suffered an Adverse Employment Action.

Negrete suffered an adverse employment action. He was fired from his employment with Maloof Distributing.  See Whitaker v. San Jon Schools, 2006 WL 1308234, at *7.

#### 3.   There is a Genuine Issue of Material Fact Whether Maloof Distributing Treated Negrete Differently than Similarly-Situated Employees.

Negrete contends that employees similarly situated to him were treated differently than him for the December 17, 2004 incident.  See Negrete's Response, at 36.  Specifically, Negrete contends that Faul and the Roswell employees who loaded the beer without an invoice were not terminated.  See id.  Negrete acknowledges that Samuels was terminated at the same time as him, but argues that Samuels had other work-place infractions, including sloppiness of work, insubordination, and discriminatory conduct.  See id.

"Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."  Aramburu v. The Boeing Company, 112 F.3d at 1403.  In determining whether Negrete and his proffered comparators were similarly-situated, the court compares "the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated."  Id.  (internal quotations omitted).

It is unclear if Negrete and Samuels had the same supervisor. While Negrete's direct supervisor was Leyva, see Leyva Depo. at 24:2-7, it appears that Samuels may have reported to Faul, see Samuels Aff. ¶ 5, at 1.  It is also unclear if Negrete and Samuels had comparable employment, because Negrete's job position is unclear.  See Negrete Aff. ¶ 8, at 2 (contending that he was a driver for Maloof Distributing); Leyva Depo. at 23:3-5 (characterizing Negrete as a merchandiser driver assistant); Bolin Depo. at 64:10-11 (characterizing Negrete as a driver/helper merchandiser).  Compare with Samuels Aff. ¶ 2, at 1 (representing that he worked as a driver for Maloof Distributing).  The exact work circumstances and the identities of the Maloof Distributing employees in Roswell who may have loaded the beer onto Samuels' truck are unknown. Nevertheless, Negrete appears to have produced sufficient evidence in the record to show that there is a genuine issue of material fact whether Negrete and Samuels were similarly situated.

Maloof Distributing concedes that Samuels and Negrete were treated differently on December 17, 2004, because Velarde called the police to arrest only Negrete. <u>See</u> Tr. at 45:21-22 (Mower).  Maloof Distributing also concedes that the reason why police were called for Negrete but not for Samuels is not  part of any evidence in the record. <u>See</u> Tr. at 46:5-7 (Mower).  Maloof Distributing contends that, regardless of that difference, Negrete and Samuels were both terminated for violating company policy. <u>See</u> Tr. at 46:9-10 (Mower).  In response, Negrete argues that Samuels had previous employment problems, <u>see</u> Negrete's Response at 36, and that otherwise, he and Samuels were similarly situated, <u>see</u> Tr. at 53:10-18 (Dixon).

Lastly, Negrete contends that Faul was treated differently than he was, although he was involved in the December 17, 2004 incident. <u>See</u> Tr. at 54:11-55:12 (Dixon & Court).  Negrete contends that while he was terminated, Faul was only demoted. <u>See id.</u>  Negrete also contends that he was treated differently than Samuels and Faul, because Maloof Distributing only pursued criminal charges against him. <u>See id.</u>

Faul was not a driver or a merchandiser -- he was a supervisor. <u>See</u> Negrete's Response at 13.  There is no indication whom Faul's supervisor was.  Faul did not lose his job, but instead was demoted to salesman and received a cut in pay. <u>See</u> Faul Depo. at 59:15-19.  Faul also testified, however, that his demotion did not result in him losing any money, because Maloof distributing compensated him for the pay cut in personal time off. <u>See id.</u> at 60:2-17.  It is unlikely that Negrete and Faul were similarly situated, because Faul was a supervisor and Negrete was either a driver or a merchandiser, and Negrete has not adduced proof that his duties were the same or similar to Faul's duties.

There does, however, appear to be sufficient evidence in the record that Negrete and Samuels were similarly situated, as drivers for Maloof Distributing.  In one sense, Maloof Distributing's

treatment of Negrete and Samuels was the same, because they were both terminated.  Maloof

Distributing, however, concedes, as it must,  that they were not similarly treated for the incident on

December 17, 2004, because the police were called only to arrest Negrete.  As such, Maloof

Distributing treated them differently for the same incident.

### D.      MALOOF DISTRIBUTING HAS ARTICULATED A LEGITIMATE, NON-DISCRIMINATORY REASON FOR ITS DECISION.

Maloof Distributing contends that it discharged Negrete because he violated a company

policy by having uninvoiced beer in his company van. <u>See</u>  Tr. at 28:19-21 (Mower).  The Action

Form indicated that Negrete was fired for "not following company procedures and pending

investigation of embezzlement by Clovis Sheriffs Dept. . . .25+ cases of product not accounted for

with no paperwork to support or explain product."  Action Form.  That alleged company policy was

contained within the March 1, 2004 Memorandum, which stated that "delivering product without

an invoice is unacceptable."  March 1, 2004 Memorandum.  Russell testified that part of the reason

he terminated Negrete was that, in his opinion, Negrete had stolen or embezzled beer from Maloof

Distributing.  <u>See</u> Russell Depo. at 35:2-7.  Maloof Distributing has presented a nondiscriminatory,

neutral reason for its termination of Negrete.

### E.      NEGRETE HAS PRESENTED EVIDENCE THAT MALOOF'S PROFFERED REASON FOR FIRING HIM IS PRETEXT.

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact

finder could rationally find them unworthy of credence and hence infer that the employer did not

act for the asserted non-discriminatory reasons." <u>Morgon v. Hilti, Inc.</u>, 108 F.3d 1319, 1323 (10th

Cir. 1997)(internal quotations omitted).  Usually a plaintiff may prove pretext "[i] with evidence that

the defendant's stated reason for the adverse employment action was false; [ii] with evidence that

the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or [iii] with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff."  Green v. New Mexico, 420 F.3d 1189, 1193 (10th Cir. 2005).

Negrete contends that Maloof Distributing had a custom and practice of allowing employees to make "hot shot" deliveries.  Negrete Aff. ¶¶ 15, 38, at 3, 9; Samuels Aff. ¶¶ 7, 10-12, at 2; Bolin Depo. at 20:20-24 (indicating that delivery of beer with a handwritten invoice happened); Faul Depo. at 19:10-23:1 (explaining that there are different types of "hot shot" deliveries); Leyva Depo. at 49:7-50:4 (indicating that "hot shot" was when delivery of beer was made on a handwritten invoice).  Maloof Distributing contends that the March 1, 2004 Memorandum forbade "hot shot" deliveries.  March 1, 2004 Memorandum.  Negrete contends that there is no Maloof Distributing policy about beer being in a company vehicle without an invoice.  See Negrete Aff. ¶¶ 29, 38, at 7, 9, Montoya Aff. ¶ 4, at 1.  Negrete contends that "hot shot" deliveries were made after the March 1, 2004 Memorandum.  See Samuels Aff. ¶ 10, at 2 (representing that he "had delivered 'hot shot' beer for Maloof Distributing both before and after March 1, 2004.").

Negrete also contends that the March 1, 2004 Memorandum was not posted in the Clovis office and that he was unaware of it.  See Negrete Aff. ¶ 19, at 4. Other employees represented or testified that they never saw the March 1, 2004 Memorandum posted at the Clovis facility and did not discuss it with anyone.  See Montoya Aff. ¶ 4, at 1; Lopez Depo. at 26:12-15.  Negrete contends that Maloof Distributing's proffered reason for firing him was pretextual, because Maloof Distributing had a custom and practice of allowing delivery of uninvoiced beer.  Negrete contends that delivery of beer without an invoice was the norm, not the exception at Maloof Distributing.  See Tr. at 19-21 (Dixon).

Negrete also contends that Maloof Distributing's proffered reasons for terminating him have changed over time.  See Tr. at 51:9-10 (Dixon).  Negrete contends that Maloof Distributing's original claim was  that it fired him for violating its March 1, 2004 Memorandum.  See Tr. at 14-16 (Dixon). Negrete represents that Maloof Distributing now contends that it fired Negrete for stealing beer.  See Tr. at 51:8-9 (Dixon).   Alternatively, Negrete contends that he did not violate the March 1, 2004 Memorandum, because he only moved beer from one company vehicle to another one.  See Negrete Aff. ¶ 26, at 6.

"A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently than other similarly-situated employees who violated work rules of comparable seriousness."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).  Negrete has adduced proof that Samuels was treated differently by Maloof Distributing for the December 17, 2004 incident because Maloof Distributing has conceded that the police were called only on Negrete and there is no explanation why they were not called for Samuels.  See Tr. at 45:21-22 (Mower).  Negrete has also presented evidence that Maloof  Distributing had an actual practice of allowing employees to make "hot shot" deliveries.  Negrete Aff. ¶¶ 15, 38, at 3, 9; Samuels Aff. ¶¶ 7, 10-12, at 2; Bolin Depo. at 20:20-24 (indicating that delivery of beer with a handwritten invoice happened); Faul Depo. at 19:10-23:1 (explaining that there are different "hot shot" deliveries); Leyva Depo. at 49:7-50:4 (indicating that "hot shot" was when delivery of beer on a handwritten invoice).

"The plaintiff is not required to present evidence of actual discrimination to establish pretext, because '[e]vidence tending to show pretext permits an inference that the employer acted for discriminatory reasons.'"  Mirzai v. State of New Mexico General Servs. Dep't, 506 F.Supp.2d at 776.  Negrete has presented evidence that permits an inference that Maloof Distributing may have

acted for discriminatory reasons, he has provided "evidence that he was treated differently than other similarly situated employees who violated work rules of comparable seriousness." Kendrick v. Penske Transp. Servs., Inc., 200 F.3d at 1230.  He has also presented evidence that Maloof Distributing's reasons have changed over time.  Such evidence may show that Maloof Distributing's stated reason or reasons are weak, implausible, inconsistent, incoherent, contradictory, and false. He also has introduced evidence that Maloof Distributing acted contrary to an unwritten policy or contrary to company practice when it fired him and called the police.  This evidence is sufficient to establish that there is a genuine issue of material fact on pretext that a jury should decide.

The Court should not grant Maloof Distributing's motion for summary judgment because of the genuine issue that the nondiscriminatory reason that Maloof Distributing proffers was pretextual. A genuine issue of material fact exists whether Maloof Distributing discriminated against Negrete by discharging him, when it may have had a custom and practice of allowing "hot shot" deliveries. Thus, its proffered nondiscriminatory reason may be pretextual.  Summary judgment is inappropriate on Negrete's discrimination claims because a genuine issue of material fact exists on Maloof Distributing's proffered reason for terminating Negrete.

## II.     MALOOF DISTRIBUTING IS NOT ENTITLED TO SUMMARY JUDGMENT ON NEGRETE'S BREACH OF IMPLIED-CONTRACT CLAIM.

Under New Mexico law, unless there is an explicit contract of employment stating otherwise, employment is terminable at will.  See Sanchez v. The New Mexican, 106 N.M. 76, 78, 738 P.2d 1321, 1323 (1987)("[U]nless there is an explicit contract of employment stating otherwise, employment is terminable 'at will,' . . . .").  "New Mexico recognizes two exceptions to this general rule, however: wrongful discharge in violation of public policy (retaliatory discharge), and an implied contract term that restricts the employer's power to discharge."  Garcia v. Middle Rio

Grande Conservancy Dist., 1996-NMSC-029, ¶ 10, 918 P.2d 7, 10 (internal quotations omitted).

Negrete does not contend that he had an explicit written contract with Maloof Distributing.

The Supreme Court of New Mexico has explained that "whether an implied contract exists

is a question of fact, and it may be 'found in written representations such as an employee handbook,

in oral representations, in the conduct of the parties, or in a combination of representations and

conduct.'" Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 10, 918 P.2d 7,

10 (quoting Newberryi v. Allied Stores, Inc., 108 N.M. at 427, 773 P.2d at 1234). For a personnel

manual to create contractual rights, however, its terms "must be sufficiently explicit to create a

reasonable expectation of an implied contract." Trujillo v. N. Rio Arariba Elec. Coop., Inc., 2002-

NCSC-004, ¶ 22, 41 P.3d 333, 342 (emphasis added). In addition, "[a]n employer's representations

which give rise to a reasonable expectation that employees will be terminated only for good cause,

may create an implied contract." Kiedrowski v. Citizens Bank, 119 N.M. 572, 575, 893 P.2d 468,

471 (Ct. App. 1995). "The reasonableness of expectations is measured by just how definite, specific,

or explicit has been the representation of conduct relied upon." Hartbarger v. Frank Paxton Co., 115

N.M. 665, 673, 857 P.2d 776, 784 (1993).

Negrete represents that James told him that non-probationary employees were fired by

Maloof Distributing only for good cause or good reason. See Negrete Aff. ¶ 4, at 2; James Depo.

at 14:11-15 (stating that it is general knowledge that non-probationary employees were fired only

for good reason or good cause, but not recalling telling Negrete that fact). Although Russell also

testified that he believed he "absolutely" had good cause to terminate Negrete, Russell testified that

it was the policy of Maloof Distributing as of December 20, 2004, that employees could be

terminated only for good cause. See id. at 35:14-17. On the other hand, Negrete signed and dated

an acknowledgment on July 15, 2002, stating that he had received the Maloof Distributing Employee

Handbook and agreed to read the handbook fully and completely.  See Maloof Distributing's summary judgment motion, Exhibit I, Acknowledgment (Doc. 44-11).  That Acknowledgment stated: "I further understand that as a matter of Company policy, all employment is offered to me at an 'employment at will' basis, meaning that I may choose to terminate my employment at any time and for any reason without notice; and the Company is free to do the same as well." Id.

Negrete contends that the disclaimer in the Handbook Acknowledgment is not dispositive.  See Negrete's Response at 30 (citing McGinnis v. Honeywell, 110 N.M. 1, 6, 791 P.2d 452, 457 (1990).   In McGinnis v. Honeywell, the plaintiff-employee signed an express employment agreement with her employer, Honeywell.  See 110 N.M. at 2, 791 P.2d at 454.  The employment agreement between the parties provided: "My employment is in accordance with any applicable written agreement and applicable personnel practices published to employees, and subject to such agreements or practices, may be terminated by me or by Honeywell at any time. . . ." McGinnis v. Honeywell, 110 N.M. at 3, 791 P.2d at 454. Honeywell went through two workforce reductions, McGinnis' employment position was eliminated, and she was laid off.  See id. at 3, 791 P.2d at 454. Honeywell had a "workforce realignment guide [that provided] in the event of a reduction in force, an exempt employee like McGinnis had the option to take a nonexempt position if he/she formerly held that job family." McGinnis v. Honeywell, 110 N.M. at 3, 791 P.2d at 454. (internal quotations omitted).

The Supreme Court of New Mexico in McGinnis v. Honeywell was "struck by the fact that the parties at trial by and large confined themselves to a dispute about whether or not an implied contract existed, without addressing the point, which struck [the Court] as fairly obvious, that there was an express contract." McGinnis v. Honeywell, 110 N.M. at 5, 791 P.2d at 456. Honeywell argued that the jury's favorable verdict for McGinnis on the implied-contract issue may have been

because it "adopted the common-sense view that, since the parties had signed an employment agreement containing a promise by Honeywell to lay off McGinnis only in accordance with certain procedures specified in the work force realignment guide . . . then the parties' conduct was sufficient to manifest an intention to be bound by the agreement."   McGinnis v. Honeywell, 110 N.M. at 1, 5, 791 P.2d at 452, 456. The Supreme Court of New Mexico noted that "'[a] contractual disclaimer does not automatically negate a document's contractual status and must be read by reference to the parties' norms of conduct and expectations founded upon them." McGinnis v. Honeywell, 110 N.M. at 6, 791 P.2d at 457.

The Acknowledgment that Negrete signed specifically provided that, "as a matter of [Maloof Distributing] policy, all employment is offered to me at an 'employment at will' basis, meaning that I may choose to terminate my employment at any time and for any reason without notice; and the Company is free to do the same as well." See Maloof Distributing's summary judgment motion, Exhibit I, Acknowledgment (Doc. 44-11).  Unlike the parties in McGinnis v. Honeywell, Negrete and Maloof Distributing had no express contract that incorporated the Handbook by reference.  See McGinnis v. Honeywell, 110 N.M. at 5, 791 P.2d at 456 (stating that it was obvious to the Supreme Court of New Mexico that the parties had an express contract). Negrete therefore still must prove the Handbook's terms or Maloof Distributing's oral representations were "sufficiently explicit to create a reasonable expectation of an implied contract." Trujillo v. N. Rio Arriba Elec. Coop., Inc., 2002-NMSC-004, ¶ 22, 41 P.3d at 342.

The Handbook specifically provided that the employment relationship was at-will, and "[e]mployers are certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason."

Lukoski v. Sandia Indian Management Co., 106 N.M. at 666-67, 748 P.2d at 509-510.  "To support the existence of an implied contract, an oral representation must be sufficiently explicit and definite."  Gormley v. Coca-Cola Enterprises, 2004-NMCA-021, ¶ 20, 85 P.3d 252, 259.  Viewing the facts in the light most favorable to Negrete, as the nonmovant, the Court must presume as true Negrete's representations that Russell's and James' statements that employees could be fired only for good cause .  In light of those statements, there is a material question of fact whether Russell's and James' statements altered the employment relationship between Maloof Distributing and Negrete.  "The question of whether an employment relationship has been modified is a question of fact."  Hartbarger v. Frank Paxton Co., 115 N.M. at 670, 857 P.2d at 781.  While the Court has given some thought to whether Negrete's reliance on these representations was reasonable, the Court believes that, the source of the representations, suggests letting the jury determine the reasonableness of any reliance.  Summary judgment is inappropriate on Negrete's implied-contract claim because a genuine issue of material fact exists whether representations by Maloof Distributing, via its supervisors altered the employment relationship between itself and Negrete.

## III.   MALOOF DISTRIBUTING IS ENTITLED TO SUMMARY JUDGMENT ON NEGRETE'S PRIMA FACIE TORT CLAIM.

For Negrete to succeed on his claim for prima facie tort, he must prove: "[i] That defendant intentionally [did some act] [failed to act]; [ii] That defendant intended that the [act] [failure to act] would cause harm to the plaintiff or that defendant knew with certainty that the [act] [failure to act] would cause harm to the plaintiff; [iii] That the defendant's [act] [failure to act] was a cause of plaintiff's harm; and [iv] That defendant's conduct was not justifiable under all the circumstances."  N.M. UJI Civ. 13-1631.  However, "[p]rima facie was not intended to provide a remedy for every intentionally caused harm."  Lexington Ins. Co. v. Rummel, 1997-NMSC-043, ¶ 11, 945 P.2d at 995.

"Although prima facie tort is not to become a catch-all alternative for every action that cannot stand on its own legs . . . [the New Mexico Court of Appeals] has been willing to recognize a prima facie tort claim, even though the conduct in question bore a resemblance to another cause of action." Hagebak v. Stone, 2003-NMCA-007, ¶ 27, 61 P.3d at 209 (internal quotations omitted).

The issue is whether the Supreme Court of New Mexico would extend the scope of prima facie tort to situations in which an investigator calls the police and makes false accusations about the plaintiff.  In evaluating the facts in the light most favorable to Negrete, Velarde injured Negrete by falsely accusing him of removing beer from Maloof Distributing's company van into a pick-up truck and reporting those acts to Clovis Police Department.  See Negrete's Response at 38.  Maloof Distributing contends that, even if Velarde made a false statement to a police officer, that would be an act contrary to law under N.M.S.A. 1978, § 30-39-1 (stating that "[i]t is unlawful for any person to intentionally make a report to a law enforcement agency or official, which report he knows to be false at the time of making it, alleging a violation by another person of the provisions of the Criminal Code. Any person violating the provisions of this section is guilty of a misdemeanor."). If Velarde's actions were unlawful, then Negrete's prima facie tort claim fails.  Prima facie tort provides  a remedy for persons harmed by intentional and malicious acts that are otherwise lawful, but fall outside of the rigid traditional intentional tort categories." Portales Nat'l Bank v. Ribble, 2003-NMCA-093, ¶ 4, 75 P.3d 838, 840 (emphasis added).  See Healthsource v. X-Ray Associates of N.M., 2005-NMCA-097, ¶ 34, 116 P.3d 861, 871 ("To state a claim for prima facie tort a plaintiff must allege [i] an intentional and lawful act . . . .")(emphasis added); Grover v. Stechel, 2002-NMCA-049, ¶ 19, 45 P.3d 80, 85 ("Prima facie tort exists only when the defendant's acts meet the following elements: [i] an intentional, lawful act . . . .")(emphasis added).  Assuming that Velarde's actions do not constitute an illegal act, which would preclude Negrete from proving prima facie tort

because that tort requires an act that is otherwise lawful, Velarde's actions still would fall into the traditional definition of defamation.  New Mexico Uniform Jury Instruction 13-1001 defines defamation as "a wrongful [and unprivileged] injury to [a person's] reputation."  N.M. UJI CIV13-1001.  "[T]here is simply no need to resort to prima facie tort" when a plaintiff has "existing causes of action provid[ing] reasonable avenues to a remedy for the asserted wrongful conduct."  Bogle v. Summit Investment Co., L.L.C., 2005-NMCA-024, ¶ 24, 107 P.3d 520, 529.

Assuming that Negrete's prima facie tort claim does not fit within the contours of defamation, he would still need to make a prima facie showing that Maloof Distributing and Velarde acted with an intent to injure him.  See Hagebak v. Stone, 2003-NMCA-007, ¶ 27, 61 P.3d at 209. Normally, it would be difficult to dispose of a cause of action on summary judgment by saying that there is not a genuine issue of fact on intent.  But the Supreme Court of New Mexico has placed  a heavy burden on the plaintiff in a prima-facie tort case:  "Plaintiffs bear a heavy burden to establish intent to injure."  Hagebak v. Stone, 2003-NMCA-007, ¶ 27, 61 P.3d at 209.  "The plaintiff must produce more than a showing that the injury is a natural and foreseeable consequence of the act." Lexington Ins. Co. v. Rummel, 1997-NMSC-043, ¶ 14, 945 P.2d at 995.  "[M]ere insensitivity" towards the injured plaintiff is insufficient to demonstrate intent to injure.  Lexington Ins. Co. v. Rummel, 1997-NCSC-043, at ¶ 14, 945 P.2d at 995.  On the other hand, the Supreme Court of New Mexico held that the tortious act "must be committed with the intent to injure the plaintiff, or, in other words, without justification, but it need not be shown that the act was solely intended to injure plaintiff."  Schmitz v. Smentowski, 109 N.M. at 395, 785 P.2d at 736.

Despite the difficulty for a defendant of showing lack of intent on summary judgment, the New Mexico courts have found that there is  no intent as a matter of law.  For example, in Lexington Ins. Co. v. Rummel, the Supreme Court of New Mexico held that the plaintiff failed to demonstrate

a material question whether the defendant intended to injure it, when the plaintiff's factual allegations indicated that the defendant "was motivated by the legitimate purpose of reducing its own liability and the liability of its insured in the fact of an enormous judgment, rather than by an intent to injure [the plaintiff]." 1997-NMSC-043, ¶¶ 5, 16, 945 P.2d at 946. Similarly, in <u>Silverman v. Progressive Broadcasting, Inc.</u>, the New Mexico Court of Appeals held that the plaintiff failed to present a material fact that a defendant acted with malicious intent when it protested the size of its logo on the billboards, because it appeared that the defendants were motivated by a legitimate business concern when they objected. <u>See</u> 1998-NMCA-107, ¶ 39, 964 P.2d at 72.

Maloof Distributing has not offered any explanation why Velarde called the police on Negrete and not on Samuels. <u>See</u> Tr. at 46:5-7 (Mower). Velarde denied making the statement contained within the Clovis Police Department Incident report. <u>See</u> Velarde Depo. at 51:23-52:9. (explaining that Velarde disagreed with the statement contained within the Clovis Incident Report that stated: "Then Mr. Velarde followed the van back to Mr. Negrete's residence and observed Mr. Negrete off-load multiple cases of assorted beer into another vehicle."). Even assuming, however, Velarde told the police that Velarde offloaded beer from his company van into the pickup, does not point to any evidence that Velarde told the police that fact solely to injure him, given Velarde's testimony that the beer was stolen. <u>See</u> Velarde Depo. at 35:18-25.

It was initially unclear from Negrete's Complaint what he contended formed the basis of his claim of prima facie tort. <u>See</u> Complaint ¶ 36, at 6 ("Although acting in an otherwise lawful manner, Defendant acted with intent to injure Plaintiff and/or acted with certainty that its conduct would cause harm to Plaintiff). In his Complaint, Negrete also incorporated by reference all of his allegations in his claims of discrimination and implied-contract for his claim of prima facie tort. <u>See</u> Complaint ¶ 35, at 6. In his Response to Maloof Distributing's motion for summary judgment,

however,  Negrete clarified that his prima facie tort claim was "because Mr. Negrete was falsely

accused by Mr. Velarde of actually removing beer from his company van into a pick-up truck."

Response at 38.  Negrete indicates that the falsity of the statements satisfies his high burden of

showing intent to do him harm.

If Negrete had contended in his Response to the motion for summary judgment that Velarde's

statements were true, and otherwise lawful, as his Complaint possibly could be interpreted, it would

be more difficult to grant summary judgment to Maloof Distributing on the lawfulness element of

Negrete's prima-facie tort claim.  On the other hand, Negrete would then have to show Maloof

Distributing's intent to injure him with Velarde's true statements, and it is not clear that he has tried

meet the difficult burden of showing there is a genuine issue of fact on intent.  In any case, because

Negrete has clarified that he contends Velarde's statements to the Clovis Police Department were

false, Velarde's statements were unlawful, and Negrete cannot base his claim for prima facie tort on

an unlawful act.  Moreover, Negrete may not maintain a claim for prima facie tort based on Maloof

Distributing's alleged discrimination against him.  See Silverman v. Progressive Broadcasting, Inc.,

1998-NMCA-107, ¶ 36, 964 P.2d at 71 ("Intentional acts by reason of sexual harassment and sexual

discrimination are unlawful acts and thus not actionable, as a matter of law, under the prima facie

tort theory."); E.E.O.C. v. MTS Corp., 937 F.Supp. at 1516 (noting that a plaintiff may not advance

a claim for wrongful termination of an at-will employment "under the guise of prima facie tort,"

because that "would emasculate the doctrine of employment terminable at will.").  Maloof

Distributing is entitled to summary judgment on Negrete's claim of prima-facie tort, because there

are no genuine issues of material fact and it is entitled to judgment as a matter of law.

**IT IS ORDERED** that the Defendant's Motion for Summary Judgment is granted in part

and denied in part.  Maloof Distributing is not entitled to summary judgment on Negrete's

discrimination claims.  Maloof Distributing is not entitled to summary judgment on Negrete's claims

of implied contract.  Maloof Distributing is entitled to summary judgment on Negrete's claim of

prima facie tort.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Eric D. Dixon
Attorney and Counselor at Law, P.A.
Portales, New Mexico

 *Attorney for the Plaintiff*

Frederick M. Mower
Sanchez, Mowrer & Desiderio, P.C.
Albuquerque, New Mexico

 *Attorneys for the Defendant*